**Gary Alan DASHIELD, Jr., Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 01–01–00697–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

April 17, 2003.

Discretionary Review Refused Sept. 24, 2003.

Lott J. Brooks, III, Houston, TX, for Appellant.

Charles A. Rosenthal, Jr., District Attorney–Harris County, Donald W. Rogers, Jr., Assistant District Attorney, Houston, TX, for Appellee.

Panel consists of Justices HEDGES,

KEYES, and DUGGAN.*

ADELE HEDGES, Justice.

## EN BANC OPINION

Appellant pleaded not guilty by reason of insanity to aggravated assault with a deadly weapon. After appellant waived his right to a jury trial, the trial court found him guilty and assessed punishment at 20 years' confinement. We affirm.

## Background

Appellant engaged in an unprovoked attack on a convenience store clerk, Dai Trang Nguyen, the complainant. In his sole point of error, appellant contends that the evidence is factually insufficient to support the trial court's rejection of his insanity defense.

## Standard of Review

■ A defendant cannot be convicted of a criminal offense if he is legally insane at the time of the crime. TEX. PEN.CODE ANN. § 8.01(a) (Vernon 2003). The standard is whether "at the time of the conduct charged" the defendant, "as a result of severe mental disease or defect, did not know that his conduct was wrong." *Id.*

■ The issue of insanity lies within the province of the jury (or, as here, the judge as sole fact-finder) to decide, not only as to the credibility of witnesses and the weight of the evidence, but also as to the limits of the defense. *Bigby v. State*, 892 S.W.2d 864, 878 (Tex.Crim.App.1994). When we review the fact-finder's rejection of an insanity defense, we must determine whether the finding is so against the great weight and preponderance of the evidence as to be manifestly unjust. *Id.* at 875.

* The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas

## Evidence Presented

The complainant was the only eyewitness who testified. She testified that, on April 4, 2000, appellant came into the convenience store where she worked. Appellant asked if the complainant had seen "a lady in pink come over here." She answered "no," and appellant left. Two hours later, appellant returned to the store with a brick in his hand. He waited in line while the complainant helped other customers. Appellant approached the counter, laid the brick on it, and then picked it up several times as if to throw it at the complainant. When the complainant reached for the telephone, appellant threw the brick at her, knocking her out. She suffered a broken jaw and facial lacerations. The complainant testified that, the first time appellant came into the store, she thought his question about the lady in pink was strange, but he looked normal. "But the second time he [sic] a little bit crazy, like, he angry," although the complainant had done nothing to provoke him. A lady dressed in pink had come in the store, but police could not establish any relationship between appellant and the lady in pink.

The store's videotape was admitted as State's exhibit 5. It shows that, as appellant left the store the first time, he looked at the complainant and said, "You're fixing to go down." When appellant returned, he approached the store four times before going in, each time tossing the brick in his hand. Once inside, he paced around, stood in line, disappeared from the camera view, and then reappeared at the counter. Appellant feigned with the brick as if to throw it at the complainant, and then threw it at her. The brick hit the com-

at Houston, participating by assignment.

plainant, and she fell to the ground. Finally, the videotape shows appellant muttering something and leaving the store.

Houston Police Officer Millard F. Waters interviewed appellant 10 days after the assault at the Harris County Psychiatric Center, where appellant was being held. Officer Waters testified that appellant was lucid, knew his whereabouts, and understood why Waters was there. Officer Waters also testified that appellant had made some responses that "were not in reference" to questions asked of him.

Appellant's sole witness was Dr. Ramon A. Laval, Ph.D., a forensic psychiatrist in the psychiatric unit of the Harris County jail for the Department of Mental Health and Mental Retardation (MHMRA). Dr. Laval acts as a consultant and is often appointed by the court to evaluate inmates' competency and sanity. Dr. Laval had been a consultant for the MHMRA since 1985. He explained that it is only in "very, very, very few occasions—less than one in a thousand—that a person would justifiably be found insane at the time of the alleged offense."

Dr. Laval examined appellant on September 28, 2000, pursuant to defense counsel's motion. He concluded that appellant was psychotic and incompetent to stand trial. After a competency hearing, the jury found appellant mentally incompetent, but also found a substantial probability that he would attain competence within the foreseeable future. A few months later, after a period of observation and treatment, the MHMRA reported to the trial court that appellant was competent to stand trial.

On January 24, 2001, Dr. Laval re-examined appellant and reviewed appellant's records from the Harris County Psychiatric Center, where appellant had been admitted after the offense. Dr. Laval testified that appellant had a history of previous psychiatric episodes. He concluded that appellant was competent to stand trial, but was insane at the time of the offense.

Although Dr. Laval repeatedly expressed his opinion that appellant was insane at the time of the offense, his testimony contained some conflicting and inconclusive statements. For example, Dr. Laval testified that appellant's behavior on the store videotape was "not consistent" with schizophrenia or other major mental disorders: "Most people who suffer from a mental illness do not commit this type of offense. So, it has nothing to do with a mental illness." Despite this inconsistency, however, Dr. Laval did not change his opinion.

Additionally, Dr. Laval testified about his uncertainty regarding exactly when appellant could not discern between right and wrong: "So, I don't know whether five minutes prior or 20 minutes prior he would have known right from wrong. Insanity or sanity is in reference to a particular act, not in reference to just any type of psychiatric condition. So, I couldn't tell you." He further testified that appellant was of normal intelligence and was not retarded, and that it was possible appellant was "just plain mean."

Moreover, Dr. Laval acknowledged the dispute—regarding the exact diagnosis of appellant's mental condition—among other mental health professionals who had examined appellant. He explained that "it is not an exact science." He testified that there has been "from time to time dispute as to actually what he was suffering from," in terms of mental disease or defect, namely whether it was schizoaffective disorder, bipolar disorder, manic depression, schizophrenia, or a combination thereof. He also conceded that persons with such men-

tal illnesses are not necessarily insane at the time of an offense.

## Insanity

■ Insanity is an affirmative defense. TEX. PEN.CODE § 8.01. A defendant bears both the burden of proof and the burden of persuasion. *Meraz v. State,* 785 S.W.2d 146, 150 (Tex.Crim.App.1990); *Taylor v. State,* 856 S.W.2d 459, 461 (Tex. App.-Houston [1st Dist.] 1993), *aff'd,* 885 S.W.2d 154 (Tex.Crim.App.1994). The purpose of the insanity defense is to determine whether the accused should be held responsible for the crime, or whether his mental condition excuses him from such responsibility. *Graham v. State,* 566 S.W.2d 941, 948 (Tex.Crim.App.1978); *Taylor,* 856 S.W.2d at 468. To establish the defense of insanity, the defendant must prove by a preponderance of the evidence that (1) because of severe mental disease or defect, (2) he did not know right from wrong at the time of the offense. TEX. PEN.CODE § 8.01.

■ Expert witnesses, although capable of aiding the trier of fact in determining the issue of insanity, do not dictate the results. *Graham,* 566 S.W.2d at 948–49. Thus, expert testimony on the issue of appellant's ability to determine right from wrong does not establish insanity as a matter of law. *Id.* at 951; *Torres v. State,* 976 S.W.2d 345, 347–48 (Tex.App.-Corpus Christi 1998, no pet.). The ultimate issue of criminal responsibility is beyond the province of an expert witness; otherwise, the issue "would be tried in hospitals rather than in courts." *Graham,* 566 S.W.2d at 949. While expert testimony may be helpful to the trier of fact, the ultimate determination of insanity is outside the purview of medical experts and should be left to the discretion of the trier of fact. *Id.* at 952–53.

■ It is not necessary for the State to present expert medical testimony that a defendant is sane in order to counter defense experts. *Id.* at 950. The trier of fact may accept or reject in whole or in part the testimony of expert medical witnesses. *Id.* at 950–51. Rarely will the trier of fact's findings regarding an insanity defense be overturned on appeal. *Id.* at 953. Accordingly, because the trial court was the sole judge of the credibility and weight to be given the testimony, the court was free to believe or disbelieve all or part of any witness's testimony. *Alvarado v. State,* 853 S.W.2d 17, 23 (Tex.Crim.App. 1993).

## Analysis

■ In addition to the expert testimony, the trial court heard lay testimony from the complainant and a police officer. The trial court also watched the videotape, which showed the offense and contained audio portions of the words spoken by appellant. There was evidence in the record to indicate that appellant approached the store four times before entering, placed the brick on the counter, picked it up several times as if to throw it at the complainant, and then threw the brick at the complainant. Appellant's equivocation could give rise to an inference that he was debating the rectitude of his assault, and thus, did appreciate the difference between right and wrong. He then left the store, which gives rise to a fair implication that he attempted to flee the scene before the police arrived. The trier of fact may consider appellant's demeanor before and after the offense, *Schuessler v. State,* 719 S.W.2d 320, 329 (Tex.Crim.App.1986), *overruled on other grounds, Meraz,* 785 S.W.2d at 155, and appellant's attempts to evade police. *Murray v. State,* 147 Tex. Crim. 474, 182 S.W.2d 475, 477 (1945).

The dissent bases its disposition on the fact that the expert's testimony was not controverted by the State. We do not believe that fact to be controlling. The State is not required to present expert medical testimony. *Wade v. State*, 630 S.W.2d 418, 419 (Tex. App.-Houston [14th Dist.] 1982, no pet.). The issue of sanity is a question for the finder of fact, who may believe or disbelieve experts or lay witnesses as it chooses. *Id.* As the Court of Criminal Appeals explained, "The doctors' conclusions in terms of the statutory defense (as distinguished from their descriptions of the diagnostic process and results, and other properly medical matters) are of negligible weight in considering this issue." *Graham*, 566 S.W.2d at 951. Opinion testimony does not establish material facts as a matter of law. *Id.* (citing *Muro v. Houston Fire & Casualty Ins. Co.*, 329 S.W.2d 326 (Tex.Civ.App.-San Antonio, 1959, writ ref. n.r.e.)).

We disagree with the dissent that the "relevant evidence leads to only one conclusion"—that appellant was legally insane at the time of the assault. The record in this case contains controverting evidence as to whether appellant knew the difference between right and wrong at the time of the offense. The trial court had the benefit of observing appellant's actions and demeanor in a videotape of the incident, hearing appellant's words in the audio portion of the tape, and listening to testimony from an eyewitness's account of the events. The trial court had sufficient information from appellant's words, actions, and demeanor during the offense to determine that appellant was legally sane. The only evidence suggesting that appellant was insane came from appellant's expert, whom the trial court found unpersuasive. There was no other expert testimony corroborating Dr. Laval's opinion. As noted above, the State was not required to present its own expert. *See Wade*, 630 S.W.2d at 419.

Credibility determinations must be left to the fact-finder at trial. The trial court reasonably could have resolved the conflicting evidence regarding insanity by concluding that appellant had not met his burden of proving insanity by a preponderance of the evidence. Therefore, the trial court's decision is not so against the great weight and preponderance of the evidence that it is clearly wrong.[1]

## Conclusion

We overrule the sole point of error and affirm the judgment of the trial court.

En banc consideration was requested.

A majority of the justices of the Court voted to consider the case en banc.

The en banc Court consists of Chief Justice RADACK and Justices HEDGES, TAFT, NUCHIA, JENNINGS, KEYES, ALCALA, HANKS, HIGLEY, and DUGGAN.

Justice HEDGES, writing for the majority of the en banc Court, joined by Chief Justice RADACK and Justices TAFT, NUCHIA, JENNINGS, ALCALA, HANKS, and HIGLEY.

Justice KEYES dissenting, joined by Justice DUGGAN.

EVELYN V. KEYES, Justice, dissenting.

I respectfully dissent. In my view, the majority fails to conduct the neutral re-

---

1. This is not a case like *Van Guilder*, wherein the defense presented five psychiatrists, including one hired by the State, who concluded the defendant was insane, and the jury found the defendant not guilty by reason of insanity on four of the five offenses committed during the same criminal episode. *Van Guilder v. State*, 709 S.W.2d 178 (Tex.Crim. App.1985).

view of all the evidence as required by the standard of review. Instead, it adopts a highly deferential standard of review under which the trier of fact is free to disregard unrebutted and uncontroverted evidence of insanity and to reject the insanity defense when there is no evidence from which a rational trier of fact could conclude that appellant was legally sane at the time of the offense. Since, under Article V, section 6 of the Texas Constitution [1], the Court of Criminal Appeals lacks jurisdiction over factual determinations, the decision of the intermediate court of appeals regarding factual sufficiency of the evidence of insanity is conclusive. It is, therefore, critical that we apply the correct standard of review.

### Fact–Finder's Role

Insanity is an affirmative defense. TEX. PEN.CODE ANN. § 8.01 (Vernon 2003). The defendant bears both the burden of proof and the burden of persuasion. *Meraz v. State*, 785 S.W.2d 146, 150 (Tex.Crim.App. 1990); *Taylor v. State*, 856 S.W.2d 459, 461 (Tex.App.-Houston [1st Dist.] 1993), *aff'd*, 885 S.W.2d 154 (Tex.Crim.App.1994). The purpose of the insanity defense is to determine whether the accused should be held responsible for the crime, or whether his mental condition excuses him from such responsibility. *Graham v. State*, 566 S.W.2d 941, 948 (Tex.Crim.App.1978); *Taylor*, 856 S.W.2d at 468. The question of insanity should focus on whether the defendant understood the nature and quality of his action and whether it was an act he ought or ought not to do. *Bigby v. State*, 892 S.W.2d at 878 (Tex.Crim.App. 1994).

The majority correctly states that "[a] defendant cannot be convicted of a criminal offense if he is legally insane at the time of the crime" and that the essential question is "whether 'at the time of the conduct charged' the defendant, 'as a result of severe mental disease or defect, did not know that his conduct was wrong.' " *See* TEX. PEN.CODE ANN. § 8.01(a). It acknowledges that in examining the factual sufficiency of the evidence relevant to the defendant's affirmative defense of insanity, we must determine whether the judgment is so against the great weight and preponderance of the evidence as to be clearly wrong. *Zuliani v. State*, 97 S.W.3d 589, 593 (Tex.Crim.App.2003). It also states correctly that "[t]he issue of insanity lies within the province of the jury (or, as here, the judge as sole fact-finder) to decide, not only as to the credibility of witnesses and the weight of the evidence, but also as to the limits of the defense." *Bigby*, 892 S.W.2d at 878. What the majority does not state is that, while the limits of the defense are left to the jury, the jury must adhere to a standard of "reasonable belief." *Graham*, 566 S.W.2d at 952 n. 3 (citing TEX. PEN.CODE ANN. § 8.02(a) (Vernon 1994)).[2] The facts may not be "resolved to one end of the spectrum outside the realm of discretion." *Graham*, 566 S.W.2d at 952 n. 3. Nor does the majority clarify the requirement that, in conducting a review of the rejection of the affirmative defense of insanity, we are required to consider all the evidence relevant to the defense in a neutral light to determine whether the finding against the affirmative defense, although adequate if taken alone, is so against the great weight and preponderance of the evidence as to be clearly

1. TEX. CONST. art. V, § 6.

2. *Graham* was decided before the legislature, in 1983, eliminated the second prong of the insanity defense, which allowed the accused to predicate insanity on the inability to conform his conduct to the law; it remains binding law in all other respects. *Taylor v. State*, 856 S.W.2d at 468 n. 2.

wrong. *See Zuliani*, 97 S.W.3d at 593; *Bigby*, 892 S.W.2d at 875.

Prior decisions of both the Court of Criminal Appeals and this and other appellate courts have set out guidelines for proof of the insanity defense. Although the defense is expressed in terms of a "mental disease or defect," the issue is not strictly medical; it invokes ethical and legal considerations as well. *Bigby*, 892 S.W.2d at 877; *Graham*, 566 S.W.2d at 948; *Taylor*, 856 S.W.2d at 468. A defendant may be insane from a medical standpoint by reason of a mental disease or defect, yet not be exonerated or excused for a crime committed in that condition unless his mental condition has reached the point where he is unable to distinguish right from wrong. *Graham*, 566 S.W.2d at 948; *Taylor*, 856 S.W.2d at 468. In deciding whether the abnormal mental condition of the accused excuses criminal responsibility, the jury is not restricted to medical theories of causation, since the "result" requirement of causation encompasses an ethical component. *Graham*, 566 S.W.2d at 953.

While it has been suggested that expert testimony is necessary to establish the "mental disease or defect" element of the insanity defense, the Court of Criminal Appeals has rejected that view. *Pacheco v. State*, 757 S.W.2d 729, 733–37 (Tex.Crim.App.1988). Because the issue of insanity is not strictly medical, but also invokes legal and ethical considerations, expert witnesses do not dictate the determination of that issue. *Bigby*, 892 S.W.2d at 877; *Graham*, 566 S.W.2d at 949; *Taylor*, 856 S.W.2d at 468–69. Nor is it always necessary for the State to present expert medical testimony that a defendant is sane to rebut defense experts. *Schuessler v. State*, 719 S.W.2d 320, 329 (Tex.Crim.App.1986); *Graham*,

566 S.W.2d at 950; *Torres*, 976 S.W.2d at 352.

However, while a jury may not give conclusive effect to the opinion of an expert merely because that opinion is not challenged by some other expert, it also may not "arbitrarily disregard" expert testimony. *Graham*, 566 S.W.2d at 950 (citing *United States v. Fortune*, 513 F.2d 883, 889 (5th Cir.1975)); *see also Brock v. United States*, 387 F.2d 254, 256 (5th Cir. 1967) (observing, "We are not unmindful of the many cases holding that expert testimony, particularly that of psychiatrists, may be adequately rebutted by the personal opinions of laymen. At the same time, the opinions of experts may not be arbitrarily ignored, and reversal has been occasioned by insufficient evidence of sanity.").

Not only lay and medical opinion, but also the circumstances of the crime are important in determining the mental state of the accused at the time of the offense. *See Pacheco*, 757 S.W.2d at 733; *Graham*, 566 S.W.2d at 951. By accepting and acknowledging that his action was illegal by societal standards, for example, a defendant indicates his understanding that others believed his conduct was wrong. *Graham*, 566 S.W.2d at 951. Attempts to conceal incriminating evidence or to elude officers can indicate the defendant's knowledge of guilty conduct. *Id.* Other relevant factors may include lay testimony regarding the lucidity of the defendant before the commission of the crime; testimony regarding other possible motives for committing the crime; other explanations for erratic behavior; attempts to eliminate witnesses; and expressions of regret and fear of the consequences. *Torres v. State*, 976 S.W.2d 345, 352 (Tex.App.-Corpus Christi 1998, no pet.).

### Evidence Regarding Sanity

Here, the majority's recitation of the facts omits any reference to the report introduced into evidence and testified to by Dr. Laval, the court-appointed expert who testified at trial. Dr. Laval based his opinion that appellant was insane at the time of the offense in part on an interview he conducted with appellant eight days after the assault on the complainant in the state mental hospital to which appellant had been committed two days later. Dr. Laval's report reflects that appellant had a history of previous psychotic episodes, including the one for which he was committed two days after the assault—running naked down the freeway. Dr. Laval testified repeatedly and unequivocally that appellant was insane at the time of the offense—*i.e.*, that he was unable to tell right from wrong. Dr. Laval was equally certain in his testimony that appellant was not feigning mental illness or malingering.

Dr. Laval testified that, when examined in the psychiatric hospital shortly after the incident, appellant reported that he saw a lady in pink go into the convenience store. Appellant followed her and asked the lady at the store if she had seen a lady in pink. She said "no"; but voices told him that the lady in pink was hiding in the back office, waiting to shoot at him with a shotgun. Appellant left and walked towards some apartments; but he was stopped by the voices who told him to get a brick and "go back and pump fake, like I was going to throw the brick at her." The voices also told him to hit the cashier, explaining that she was a martial artist and worked for the CIA and that the lady in pink was also with the government. Appellant told Dr. Laval that he somehow knew they were also involved with the Ku Klux Klan and were responsible for his uncle's death. The voices told him to wait in line until it was his turn at the register. As he waited,

he felt the cashier was the enemy of the state. He threw the brick at her because he saw her moving and was afraid of where the lady with the shotgun was. After hitting the complainant with the brick, he left the store and went walking around.

The State offered no rebuttal evidence—either expert or lay—on appellant's mental condition at the time of the offense. The only evidence of appellant's mental condition at that time of the offense was the insanity report, and Dr. Laval's expert opinion that appellant was unable to differentiate between right and wrong at the time of the offense, an opinion based on his interview with appellant and his extensive experience as a forensic psychiatrist in the psychiatric unit of the jail and court-appointed consultant on the assessment of inmates' competency and sanity. Neither the complainant nor the arresting officer offered an opinion as to whether appellant knew the difference between right and wrong at the time of the offense, other than complainant's testimony that he looked "a little bit crazy." Neither testified to circumstances that indicated appellant was sane at the time of the offense.

On appeal, instead of relying on rebuttal evidence of sanity, the State relied principally on four statements made by Dr. Laval at trial to support its argument that the trial court's judgment was not against the great weight and preponderance of the evidence; and the majority bases its conclusion of the factual insufficiency of appellant's insanity defense primarily on these purported "conflicting and inconclusive statements." When these statements are examined in the larger context of the questions and answers surrounding them, however, they fail to support the State's position or the majority's inference that Dr. Laval's testimony was either "conflicting" or "inconclusive."

First, the majority states that, after he was shown the videotape of the assault at the trial, Dr. Laval acknowledged that the behavior he saw in the video "is not consistent with anybody who suffers from schizophrenia or any other major disorder. Most people who suffer from a mental illness do not commit this type of offense. So, it has nothing to do with a mental illness." *However,* Dr. Laval continued, "If the question is: Having viewed the actions that he [appellant] was engaged at the time of the commission of the offense, did I come to a conclusion that maybe he was not insane? I can answer that. No, that didn't change my opinion." Dr. Laval explained, shortly before this testimony, that the videotape cannot show "what it is that [appellant]'s responding to internally. We, of course, have no access to any voices or delusions that he may have experienced." Afterwards, in response to the court's question, "After seeing the event, what is your opinion as to what the mental illness was the day of the alleged offense?," Dr. Laval responded:

> To make sure that I understand the question and so my answer will be in that context, I do not think that the incident depicted in the tape will give us information about what type of mental illness the defendant was suffering. But I can say that the defendant suffers from a psychotic illness or an illness that reaches psychotic proportions. And that it is very probably a schizophrenic disorder that he suffers from that needs treatment and needs treatment on an ongoing basis.

Second, the majority describes Dr. Laval as being uncertain about the exact time frame in which appellant knew right from wrong. The exchange, however, makes it clear that the State was attempting to elicit testimony as to whether Dr. Laval had an opinion that appellant should not be held criminally responsible. Dr. Laval testified as follows:

> I am not the one who says he should not be held criminally responsible. That is the law. . . . In other words, the law says those who are found insane are not guilty by reason of insanity. I can only render an opinion that I, as a psychologist, believe he was insane. He was exhibiting symptoms of a mental illness of sufficient severity that stopped him from being able to differentiate right from wrong.

When the State then asked, "[H]ow long do you think it had been going on that he didn't know the difference between right and wrong?," Dr. Laval responded, "The important question there is—the important part of the question to me is whether he knew right from wrong is only related to an actual act that he may have committed. . . . Insanity or sanity is in reference to a particular act, not in reference to just any type of psychiatric condition. So I couldn't tell you."

Dr. Laval explained that if appellant had been charged with running out naked on the streets as he did days after the alleged offense and somebody asked Dr. Laval if appellant was sane at the time, "I probably would have come to the opinion that at the time he was not. That he did not know right from wrong. In fact, he thought he was doing something right, cleansing his soul by getting naked." Dr. Laval had just testified that, at the time of the offense, appellant "was exhibiting symptoms of a mental illness of sufficient severity that stopped him from being able to differentiate right from wrong."

Third, when asked if it was "in the realm of possibility" or "possible" that appellant was "just plain mean," Dr. Laval answered that it was. The State then asked, "But would that be in the context of a—we call it a psychotic episode?" Dr. Laval replied,

"[T]here are individuals who are just purely mean. . . . Then we have individuals who may act in a very mean way. But because of their mental illness, they were insane at the time. And it is my opinion that this is what happened with this defendant."

Finally, the State and the majority point to the fact that Dr. Laval acknowledged that there was a dispute concerning appellant's exact diagnosis—*i.e.*, whether he suffers from schizoaffective disorder, bipolar disorder, manic depression, schizophrenia, or a combination thereof. However, Dr. Laval made it clear that the common denominator is psychotic symtomatology, regardless of the precise cause of appellant's psychosis. Although the State and the majority describe this testimony as "conflicting" and "inconclusive," the precise medical diagnosis of appellant's condition is irrelevant to whether he was symptomatic at the time of the incident. *See Graham*, 566 S.W.2d at 951. Dr. Laval consistently testified that appellant was insane and unable to tell right from wrong at the time of the offense. Dr. Laval also acknowledged that not all people who are mentally ill are necessarily insane at the time of an offense. However, it does not follow from the fact that *some* mentally ill people are legally sane at the time they commit an offense that *appellant* was legally sane. *Id.* Dr. Laval did not change his opinion that appellant was insane at the time of the offense.

In short, the State did not elicit any evidence of appellant's sanity from Dr. Laval's testimony; nor was there evidence from any other source of appellant's sanity at the time of the incident. The State did not offer expert or lay witnesses who testified as to appellant's sanity or who rebutted any of Dr. Laval's testimony. The only evidence as to appellant's motivation, other than the complainant's testimony

that appellant looked "a little bit crazy," is Dr. Laval's testimony regarding his interview with appellant, which expresses a mental state entirely consistent with the complainant's testimony and the videotape, as well as with legal insanity.

The circumstances of the crime were also ignored by the trial court and the majority. No evidence was presented of possible motives for appellant's behavior or explanation for his behavior other than insanity; there was no testimony on appellant's motivation from Officer Waters; and the videotape, as Dr. Laval testified, was incapable of showing motivation. Although the circumstances of the crime are always important in determining the mental state of the accused at the time of the offense, the circumstances in this case—appellant's "little bit crazy" look, his question about the "lady in pink," his unprovoked threat that "you're going to go down," his return to the store, his approaching the store repeatedly before going in, his pacing and waiting in line, his feinting with the brick, his unmotivated attack on the complainant—fail to support a reasonable inference of sanity.

Moreover, appellant did not confess, attempt to eliminate witnesses or evidence, flee from the police, express guilt or remorse, have a motivation to harm the complainant, or take any steps that indicated he knew his conduct was wrong—acts that are considered evidence that a defendant was sane. *See Schuessler*, 719 S.W.2d at 330 (holding that evidence that defendant disposed of body near border check-point suggested he knew his acts were wrong, and testimony of several lay witnesses that defendant's conduct did not indicate insanity supported jury's rejection of insanity defense). *Torres*, 976 S.W.2d at 347–48;[3] *Taylor*, 856 S.W.2d at 470.

---

**3.** The majority indicates that the trial court's

watching the videotape of appellant's "equiv-

There is literally *no evidence* that appellant knew the difference between right and wrong at the time of the offense, while there is unrebutted testimony from Dr. Laval, based on his interview with appellant and his experience, that he did not. Nor is there anything in the circumstances to indicate that appellant knew or contemplated the difference between right and wrong at the time of the offense. There is nothing in the record to rebut or controvert a finding of insanity. Moreover, there is no basis for imputing to the trial court a finding that Dr. Laval's testimony is not credible. As the majority acknowledges, Dr. Laval has been a forensic psychiatrist working in the psychiatric unit of the Harris County jail and is "often appointed by the court to assess inmates for whom it has ordered competency and sanity evaluation"; he has been a consultant for the Department of Mental Health and Mental Retardation since 1985 with regard to competency and sanity at the jail; and he testified that, in his opinion, it is only in "very, very, very few occasions—less than one in a thousand—that a person would justifiably be found insane at the time of the alleged offense." It is difficult to see in the trial court's, and the majority's, rejection of Dr. Laval's testimony anything other than the "arbitrary disregard" of expert testimony condemned by the Court of Criminal Appeals in *Graham*, 566 S.W.2d at 950; *see also Fortune*, 513 F.2d at 889; *Brock*, 387 F.2d at 256.

The relevant evidence leads to only one conclusion—appellant did not know the difference between right and wrong when he assaulted the complainant. The judgment of the trial court is, in my view, not only against the "great weight and preponderance" of the evidence, when all of the evidence is viewed in a neutral light; it is entirely unsupported by any evidence and is contrary to the *only* relevant evidence. There were no factual issues for the trial court to resolve. Thus, the factual determination made by the trial court in rejecting appellant's insanity defense was "resolved to the far end of the spectrum" and was "outside the realm of discretion" accorded the fact finder, contrary to the standard of proof of factual sufficiency established by the Court of Criminal Appeals. *See Graham*, 566 S.W.2d at 952 n. 3. Consequently, the finding of the "vital fact" of sanity by the trial court was "so contrary to the great weight and preponderance of the evidence as to be clearly wrong." *Zuliani*, 97 S.W.3d at 593.

This case is startlingly similar to *Van Guilder v. State*, 709 S.W.2d 178 (Tex. Crim.App.1985), *overruled on other grounds by Meraz v. State*, 785 S.W.2d 146, 155 (Tex.Crim.App.1990). Van Guilder had previously been diagnosed as schizophrenic. She burst through the doors of two separate apartments, one after the other, yelling, "You're gonna pay, you killed her," and "You killed her, and you're gonna pay for it"; whereupon, she shot five people, killing one, then threw her pistol away and fled. *Van Guilder*, 709 S.W.2d at 182. She was apprehended close to the scene after jumping or falling

---

ocation" before throwing the brick was sufficient to "give rise to an inference that he was debating the rectitude of the assault" and his leaving the store after throwing the brick at the complainant "gives rise to a fair implication that he attempted to flee the scene before the police arrived." These speculative inferences, however, ignore the actual circumstances, including appellant's "little bit crazy"

look "like he angry" [sic] as he feinted with the brick three times in rapid succession and his statement that he left the store and went walking around, which is corroborated by the deliberate way, shown on the tape, in which he walked from the store after throwing the brick, as the bystanders stood passively around.

off an embankment onto the apron of an interstate highway. *Id.* She explained to the police at the hospital where she was taken that someone told her she had to save the children; "They were hurting the children. I had to stop it." *Id.* at 183. At trial, Van Guilder testified that she believed she was jogging in a race like that in the movie "Chariots of Fire" and she believed she was being followed by a "big green car with a fat lip." *Id.* Five medical experts testified that Van Guilder was insane at the time of the offense; and the State produced no rebutting evidence. *Id.*

The jury acquitted Van Guilder of murder and three of the attempted murders on the basis of insanity, but found her guilty on one count of attempted murder. Id. at 184. The court of appeals reversed the conviction on the ground that the jury finding was against the great weight and preponderance of the evidence, and the Court of Criminal Appeals affirmed, despite raising the standard of review to a very deferential "no evidence" standard, which the Court of Criminal Appeals subsequently overruled in *Meraz* because it found the standard too high.[4] *Van Guilder*, 709 S.W.2d at 179, 183; *Meraz*, 785 S.W.2d at 155.[5]

In an eloquent concurrence in *Van Guilder*, Justice Teague explained why the State erred in suggesting that, regardless of the quality or quantity of the evidence

on the affirmative defense of insanity, a reviewing court could not disturb the jury's guilty finding.

This is simply not the law of this State, and has never been the law of this State . . . .

[W]hen an accused person presents any affirmative defense, he or she has the burden to establish that defense by a preponderance of the evidence. Once the accused person has satisfied that burden, and the State controverts or rebuts such defense, it then becomes the responsibility of the trier of fact to make the determination whether the accused person established his defense by a preponderance of the evidence. *If the evidence is uncontroverted, as it was here, there is nothing for the trier of fact to decide, and the trial judge should instruct the jury to return a verdict of not guilty because of the uncontradicted and uncontroverted affirmative defense.*

Under our present law, the State has no burden to negate or disprove any affirmative defense, such as insanity. Nevertheless, and contrary to what occurred in this case, it must not sit idle if the accused person presents an affirmative defense by credible evidence.

. . . .

*In this instance, there is simply no testimony, either medical or lay, from*

4. In overruling *Van Guilder,* the Court stated, "Implicit in the Court's opinion in *Van Guilder* is the inescapable conclusion that if there is any evidence presented to rebut the insanity defense then the 'implicit jury holding that appellant did not prove, by a preponderance of the evidence, that she was insane at the time of the offense,' can never be deemed irrational." *Meraz,* 785 S.W.2d at 151 (quoting *Van Guilder,* 709 S.W.2d at 182).

5. The majority distinguishes *Van Guilder* on the grounds that (1) the defense presented five psychiatrists, including one hired by the State, who concluded the defendant was in-

sane and (2) that the jury found the defendant not guilty by reason of insanity on other related counts. The quality of expert testimony is not a quantitative measure; one bishop swearing on a Bible is as good as five, so long as the bishop is unimpeached. Here, as befits a single-count offense in which the defendant is indigent, there was only one court-appointed expert, whose substantial credentials and credibility were never called into question by the State and whose testimony was unimpeached and unrebutted by either expert or lay testimony.

*which any rational trier of fact could conclude that the appellant was sane at the time of the offense. It is now axiomatic that a jury that totally disregards credible and uncontradicted evidence cannot be considered to have acted as a rational trier of fact.*

709 S.W.2d at 183–85 (Teague, J., concurring) (emphasis added).

Even applying the more deferential 'no evidence' standard of proof of insanity adopted by the Court of Criminal Appeals in *Van Guilder*—and subsequently overruled as too high a standard in *Meraz*—I would still find that appellant proved his insanity defense and that the trial court's finding that he did not is not only so against the great weight and preponderance of the evidence as to be clearly wrong, but such that no rational fact-finder could have found appellant sane and therefore guilty beyond a reasonable doubt. As the authorities cited above make clear, the finder of fact is *not* free, as the majority asserts, to "believe or disbelieve experts or lay witnesses as it chooses." Its discretion is limited to *reasonable* inferences; and it may not arbitrarily disregard expert testimony when it is unrebutted and uncontroverted. *Graham,* 566 S.W.2d at 950, 952, n. 3; *Van Guilder,* 709 S.W.2d at 185 (Teague, J., concurring).

The majority's quotation from *Graham,* 566 S.W.2d at 951, stating that a "doctors' conclusions in terms of the statutory defense … are of negligible weight in considering this issue," *i.e.,* the ultimate issue of sanity or insanity, is, in my view, misleading. As the context of the quotation from *Graham* makes clear, the doctors' conclusions to which reference was being made in that case were conclusions drawn by the defendant's doctors six months before the offense, at which time his condition was in remission, and eighteen days after the offense, "when appellant was charged with a serious offense, and no doubt was under a considerable degree of stress from the proceedings against him." *Graham,* 566 S.W.2d at 951. The court stated, "It cannot be said as matter of law that the diagnosis in late September and October may be projected back to the offense and held conclusive as to that date. Also, as the doctors testified, schizophrenia is characterized by remissions and recurrences that come at irregular and unpredictable intervals." *Id.* The court concluded that the experts' "conclusions in this case are not shown to rest on anything more than a general deduction from the diagnostic classification of appellant as schizophrenic." *Id.* These expert conclusions in *Graham* were of little weight because they rested on nothing more than "a general deduction" from the classification of the appellant as schizophrenic rather than on the examination of the defendant near the time of the offense or based on the actual circumstances of the offense, as here.

Nothing could be further from the expert (and lay) testimony in this case, detailing appellant's previous history of mental illness, his bizarre behavior and "crazy look at the time of the offense, his psychotic episode two days after the" offense, and his interview with Dr. Laval in the psychiatric hospital to which he was thereupon committed. The insanity report not only explains appellant's mental state, but accords perfectly with the behavior visible on the videotape of the offense, as well as with the testimony of the only eyewitness who testified, the complainant. In short, the expert testimony in this case is not conclusory or irrelevant, but highly probative of appellant's mental state at the time of the offense; and the circumstances, which the Court of Criminal Appeals held in *Graham* "are always important in determining the mental state of the accused at

the commission of the offense," likewise evidence only appellant's insanity. 566 S.W.2d at 951.

Finally, the majority overread the quotation, taken from *Graham*, that "[o]pinion testimony does not establish material facts as a matter of law." *Graham*, 566 S.W.2d at 951(quoting *Muro v. Houston Fire & Cas. Ins. Co.*, 329 S.W.2d 326 (Tex.Civ. App.-San Antonio 1959, writ ref'd n.r.e.)). The context explains the role of the expert: "The expert witnesses—psychiatrists and psychologists—are called to adduce relevant information concerning what may for convenience be referred to as the 'medical' component of the responsibility issue," but the decision on the ultimate issue of legal responsibility goes beyond that, "intertwining moral, legal, and medical judgments." *Graham*, 566 S.W.2d at 950 (quoting *United States v. Brawner*, 471 F.2d 969, 982–83 (D.C.Cir.1972)).

In my view, *Graham* does not state or imply that unrebutted and uncontroverted expert testimony is insufficient to establish that a defendant, as a result of mental disease or deficit, could not differentiate between right and wrong at the time of the offense, in the absence of contravening evidence. But even if the majority is correct, and expert testimony may be utterly disregarded by the trier of fact and utterly disregarded on appellate review of factual sufficiency of the evidence, even when it is based on a contemporaneous insanity report by an experienced psychiatrist employed by the State, the overwhelming preponderance of the evidence of this case, both from lay testimony and the tape of appellant's actions, would still show appellant's insanity at the time of the offense. The review would, however, no longer be neutral, but weighted against the defendant.

Here, appellant properly established his insanity defense through the insanity report and expert testimony of Dr. Laval, evidence corroborated by the videotape and by the complainant's testimony. That evidence was entirely uncontroverted and unrebutted by either expert or lay testimony. Nothing in the circumstances indicates that appellant was sane at the time of the offense. Under these circumstances, the trial court plainly erred in rejecting the insanity defense; and the majority compounds the error by creating a standard of review of insanity under which expert testimony, regardless of the facts on which it is based, is of "negligible" value and the finder of fact is free to disregard *all* credible and unrebutted evidence on the issue of insanity if it so chooses. The standard of proof of insanity and the standard of review employed by the majority are both much higher than those established by law and precedent.

How we conduct our review of this case is critical because, when an intermediate appellate court examines all of the evidence concerning an affirmative defense like insanity, and then determines whether the finder of fact could have found that a defendant failed to prove his defense by a preponderance of the evidence, it is exercising its factual sufficiency jurisdiction— jurisdiction which the Court of Criminal Appeals is barred from exercising by Article V, section 6 of the Texas Constitution. *Meraz*, 785 S.W.2d at 154–55. Our decision on the factual sufficiency of the evidence supporting an affirmative defense of insanity is conclusive. *Id.* at 155. It is essential, therefore, that we employ the standard of proof called for by law and not establish our own, higher standard, which is so deferential to the finder of fact as to amount to no review at all. Accordingly, I would reverse the judgment and remand

the cause to the trial court.[6]

6. The Court of Criminal Appeals has held that the proper ruling on reversal based on a factual sufficiency challenge is remand for a new trial. *Meraz,* 785 S.W.2d at 156.