In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-10-00107-CR

                                                ______________________________

 

 

                          WILLIAM THOMAS LANTRIP, SR.,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                        On Appeal from the 71st Judicial District Court

                                                           Harrison County, Texas

                                                         Trial Court
No. 09-0205X

 

                                                     
                                             

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                                    Opinion by Chief Justice Morriss








                                                                   O P I N I O N

 

            Although
doctors had told seventy-three-year-old William Thomas Lantrip, Sr., not to
drink, because drinking was “interactive” with a decades-old brain injury,
Lantrip regularly consumed much alcohol.[1]  On Good Friday, 2009, after drinking at least
half a case of beer, Lantrip shot his neighbor Kenny Gordon in the back, a
wound ultimately proving fatal.[2]  From the resulting conviction and life
sentence for murder, Lantrip appeals.  We
affirm[3]
the trial court’s judgment because (1) Lantrip did not prove he was
insane; (2) Lantrip was not entitled to admonishment regarding his trial testimony;
(3) no newly discovered evidence entitles Lantrip to a new trial; and
(4) at trial, Lantrip was not entitled to be dressed, as he chose, in
camouflage clothing.

(1)        Lantrip Did Not Prove He Was Insane

 

            Lantrip
claims error in the jury’s rejection of his affirmative defense of
insanity.  He claims the State failed to
rebut Lantrip’s proof.  We cannot say the
jury’s rejection of his asserted defense was error.

            Insanity
is an affirmative defense.  A defendant
asserting the defense must prove “that, at the time of the conduct charged, the
actor, as a result of severe mental disease or defect, did not know that his
conduct was wrong.”  Tex. Penal Code Ann. § 8.01(a) (Vernon 2003). 
In a jury trial, the issue of the defendant’s sanity may be presented to
the jury[4]
only if the issue is supported by competent evidence.  Tex.
Code Crim. Proc. Ann. art. 46C.151(a) (Vernon 2006).  Defendants are presumed to be sane and the
State carries no burden to prove sanity.  Manning
v. State, 730 S.W.2d 744, 748 (Tex. Crim. App. 1987); Sims v. State, 807 S.W.2d 618, 626 (Tex. App.—Dallas 1991, pet. ref’d).
 A defendant asserting the affirmative
defense of insanity bears the burden of proof. 
Meraz v. State, 785 S.W.2d
146, 150 (Tex. Crim. App. 1990).  To
succeed on such claim, the defendant must prove by a preponderance of the
evidence that he or she was insane during the commission of the offense.  Tex.
Penal Code Ann. § 2.04
(Vernon 2003); Martinez, 867 S.W.2d 30,
33 (Tex. Crim. App. 1993).  Insanity is
not established by a defendant’s claim to have been unconscious or
semiconscious during the offense.  Mendenhall v. State, 77 S.W.3d 815, 818
(Tex. Crim. App. 2002).

            Where
a defendant bears the burden of proof on an affirmative defense such as
insanity, the standard of review is whether, after considering all the evidence
relevant to the issue at hand, the judgment is so against the great weight and
preponderance of the evidence so as to be manifestly unjust.  Meraz,
785 S.W.2d at 155.[5]

            Lantrip
took the stand in his case-in-chief to assert his defense of insanity.  He described how, in his twenties, he had
fallen from a moving truck and struck his head on a rock.  As a result, he began to suffer blackouts and
severe headaches, including migraines.  During
this period, he was in the Marine Corps. 
Lantrip said at one point he was confined to a mental ward for six
months after pulling a pistol on his commanding officer.  Some of Lantrip’s military medical records were
admitted into evidence, including a 1957 document which included the following
diagnosis:

Paranoid schizophrenia, in partial or almost
complete remission at the present time but manifested just before admission by
very critical and emotionally charged display of feelings toward his own
family.  Also, manifested by general
paranoid tendency toward everyone when he gets to feeling threatened.  Treated. 
Improved. . . .  Degree of
psychiatric impairment:  Minimal to
moderate at present.

 

Lantrip eventually received an honorable
discharge.  Because he was found to have
a 100% disability, his mother was made his guardian.  His disability rating was later lowered to
70%.

            In
his testimony, Lantrip detailed for the jury his history of violent escapades,
including shooting, three times, a man who had been picking a fight with him in
1956; the last two shots were after Lantrip had succeeded in getting his
attacker off of him.  In 1964, he shot
the car of a man reportedly caught on a date with Lantrip’s wife, and, when
tackled by someone to stop him, also shot his wife’s sister in the leg, causing
her to lose the limb.  In 1969, he fired
several shots into a house occupied by his ex-wife and her brother, because he
believed they were engaged in incest in front of Lantrip’s children.  In 1986, Lantrip repeatedly stabbed a man he thought
was attacking him with a knife, although it later turned out the man had no
knife.  

            As
for the incident leading to Gordon’s death and Lantrip firing at the deputies, Lantrip
told the jury he did not remember any of it. 
He said he could not remember events from April 9, the day before the
shooting, or from April 10.  He claimed
that his lack of memory of the events was evidence that he was insane at the
time.  He conceded, based on other
witnesses’ testimony, he had been drinking April 10, but could not remember how
much.  He also testified he “limited” his
drinking during “work hours” to “no more than half a case a day.”  However, State’s psychologist Thomas Allen
testified that Lantrip told him he drank a case of beer a day and that Lantrip
knew he was an alcoholic.  Lantrip told
Allen it was his practice to begin drinking at 4:00 a.m.  Several witnesses testified that, on the day
of the shooting, Lantrip was very intoxicated, that he was staggering and
having great difficulty standing to the point he was using his shotgun as a
cane and to help him stand.  Two
witnesses, Lamkin and neighbor Joseph Hudson, described Lantrip as “mean” when
he was drinking.  Lantrip admitted that doctors
had told him not to drink because alcohol was “interactive” with his brain
injury.  Allen testified lack of memory
of the events surrounding the shooting could have been the result of Lantrip’s
heavy drinking or of trauma from being shot by the deputy.  Allen added that trauma-induced amnesia was
more likely in a heavy drinker.  

            Allen
opined that Lantrip was not insane at the time of the shooting and was able to
discern right from wrong.  Allen cited,
as bases for his conclusion that Lantrip could tell right from wrong, that Lantrip
told Allen he would pay a neighbor to drive him around so as not to get caught
drinking and driving and that Lantrip was reported as threatening to kill
Lamkin if he called the police to report Lantrip’s earlier threatening behavior.  Allen interpreted this conduct as indicating
an awareness of the wrongfulness of Lantrip’s actions.  As for Lantrip’s 1957 medical records
assessing paranoid schizophrenia, Allen said contemporary diagnostic standards
are much more stringent than the standards in place in the 1950s.  Allen did not believe the behavior described
in Lantrip’s 1957 evaluation would qualify as paranoid schizophrenia under
current evaluation standards; rather, Lantrip’s 1957 behaviors would more likely
meet contemporary diagnoses of antisocial personality or antisocial features,
anxiety disorder, or “the weakest of a brief psychotic disorder even or a
reactive psychosis.”  There was no
indication Lantrip was prescribed medications for the 1957 psychiatric
diagnosis or that Lantrip was on any medication at the time of Allen’s
interview.  

            Where
conflicting evidence on the issue of insanity is presented, determinations
regarding the weight and credibility of that evidence should be resolved by the
fact-finder, and we defer to those decisions, because the fact-finder has the
benefit of observing the witnesses’ actions and demeanor.  Dashield
v. State, 110 S.W.3d 111, 116 (Tex. App.—Houston [1st Dist.] 2003, pet. ref’d).  The jury was free to reject Lantrip’s
evidence and find that he had failed to prove his insanity defense.  It is true, as Lantrip stresses, that most of
the State’s witnesses agreed with defense counsel that Lantrip’s acts did not
make sense, but violence is often senseless. 
The jury was free to reject Lantrip’s assertion that his warnings to Lamkin
and Maxwell not to call the police, contrasted with his supposed wish to commit
“suicide by cop,” were evidence of his insanity.  The jury could well have determined that
Lantrip was habitually drunk, explaining his supposedly inconsistent positions
regarding law enforcement.

            Lantrip
invites us to use the Texas Probate Code’s definition of incompetency to
evaluate Lantrip’s sanity.  We
decline.  Lantrip’s theory is that
because, in the late 1950s the Veteran’s Administration ordered Lantrip’s
disability checks be paid to his mother as guardian for Lantrip, he is
incapacitated under the terms of the Texas Probate Code.  Lantrip relies on this reasoning as further
evidence of his insanity.  Lantrip’s
reasoning here fails, as incompetency in the Texas Probate Code and insanity in
the Texas Penal Code are different concepts.

            Lantrip
offers no explanation or authority how the Texas Probate Code would apply to a
criminal proceeding.[6]  He cites us generally to Section 694F of the
Texas Probate Code, which concerns a trial court order restoring a ward’s
capacity.  Tex. Prob. Code Ann. § 694F (Vernon 2003).  The Texas Probate Code speaks in terms of
capacity or incapacity, where an incapacitated person is one “who, because of a
physical or mental condition, is substantially unable to provide food,
clothing, or shelter for himself or herself, to care for the individual’s own
physical health, or to manage the individual’s own financial affairs” or one “who
must have a guardian appointed to receive funds due the person from any
government source.”  Tex. Prob. Code Ann. § 3(p)(2), (3)
(Vernon Supp. 2010).[7]  To the extent a guardian was deemed necessary
for Lantrip fifty years ago, that was evidence which the jury was free to
consider or reject, along with the other much more relevant evidence, in
determining whether Lantrip proved his affirmative defense of insanity at the
time of the instant offense.

            In
concluding his discussion of this point of error, Lantrip asserts, “[T]he State
did not carry its burden of proving sanity beyond a reasonable doubt.”  As stated above, defendants are presumed
sane, and insanity is an affirmative defense to be asserted and proved by a
defendant.  It is true that, if evidence
is admitted of a prior, unvacated adjudication of insanity, the burden shifts
to the State to prove, beyond a reasonable doubt, the defendant’s sanity at the
time of the offense.  Manning v. State, 730 S.W.2d 744, 748 (Tex.
Crim. App. 1987).  Although Lantrip
relied on evidence of his mental health diagnoses from the 1950s to prove his
insanity defense, there was no evidence of a prior adjudication of insanity.[8]  Thus, the burden remained Lantrip’s.  After reviewing all the evidence, we cannot
say the jury’s rejection of Lantrip’s claim of insanity is so against the great
weight and preponderance of the evidence as to be manifestly unjust.  Meraz,
785 S.W.2d at 155.

(2)        Lantrip Was Not Entitled to Admonishment
Regarding His Trial Testimony

 

            Lantrip
was the only defense witness at the guilt/innocence stage of trial.  As summarized above, he testified about his
head injury, his violent past, his drinking habits, and claimed that he blacked
out on the day of the shooting.  Before
Lantrip testified, outside the presence of the jury, the trial court told
Lantrip he possessed a constitutional right to remain silent, and no one,
including the court, could force him to testify.  The court told Lantrip that, if he decided to
testify, the State would be able to “ask any questions that they want to ask”
and Lantrip would “have to respond.” 
Lantrip told the trial court he understood this and agreed he made the
choice to testify freely and voluntarily and was not being forced or coerced.  After the trial court questioned Lantrip, his
defense counsel confirmed that it was Lantrip’s desire to testify in order to
assert his defense of insanity and tell his version of the events.  

            On
appeal, Lantrip claims the trial court’s admonishments were insufficient and
thus caused reversible error.  We
disagree.

            A
trial court has no duty to advise a testifying defendant, represented by
counsel, of his or her right not to testify. 
Newell v. State, 461 S.W.2d
403, 404 (Tex. Crim. App. 1970).  While
it is true Newell involved a plea of
guilty, we have found no authority or reason why the same does not apply where
a defendant pleads not guilty.  When a
defendant, represented by counsel, takes the stand to testify in his or her own
defense, we presume that the act is done voluntarily and with full knowledge of
the defendant’s rights.  Mullane v. State, 475 S.W.2d 924, 926
(Tex. Crim. App. 1971).

            Lantrip
complains on appeal he was not told that evidence or testimony elicited from
him could be used to incriminate him.[9]  He offers, though, no authority establishing
any duty by the trial court to admonish him at all.  See
Newell, 461 S.W.2d at 404.  Lantrip clearly told the trial court he
understood that the State’s attorney would be able to cross-examine him.  The record supports a finding that Lantrip’s
waiver of his right not to testify was made knowingly and voluntarily.  We overrule this point of error.

(3)        No Newly Discovered Evidence Entitles
Lantrip to a New Trial

 

            Lantrip
also claims the trial court erred in not granting his motion for a new trial.  A new trial shall be granted to an accused
where material evidence favorable to the accused has been discovered since
trial.  Tex.
Code Crim. Proc. Ann. art. 40.001 (Vernon 2006).  Not only does the decision to grant or deny
such a motion fall within the sound discretion of the trial court, subject to
reversal only on a finding of an abuse of that discretion, but these motions
are generally disfavored by the courts and viewed with great caution.  Lewis v.
State, 126 S.W.3d 572, 579 (Tex. App.—Texarkana 2004, pet. ref’d).  A trial court does not abuse its discretion in
denying a motion for new trial unless the record demonstrates that (1) the
newly discovered evidence was unknown at the time of the trial; (2) the failure
to discover the new evidence was not due to a lack of diligence; (3) the new
evidence is admissible and not merely cumulative, corroborative, collateral, or
impeaching; and (4) the new evidence is probably true and will probably bring about
a different result in a new trial.  Id.[10]  None of these requirements are present here.

 

            At
the hearing on the motion for new trial, Lantrip offered an excerpt from the
hospital records where he was admitted after being shot by Deputy Johnson.  Lantrip directed the trial court to the
sections noting, “Neuro:  Positive for
altered mental status” and “Neuro: 
Orientation:  Not oriented to
person, place, time.  Mentation:  confused.”  Lantrip admits that he is not relying on this evidence
as “newly discovered,” but argues that it could have been used to impeach or
contradict the State’s trial expert, psychologist Dr. Tom Allen.  This may be, but Lantrip must still establish
the elements listed above to be entitled to a new trial.

            There
is nothing to suggest Lantrip’s own medical records were not available to him
before trial.  We cannot say the initial
diagnostic notes are material to Lantrip’s defense of insanity.  The doctor’s written comments that Lantrip
had an “altered mental status,” was “[n]ot oriented to person, place, [or] time”
and was “confused” were corroborative and cumulative to Lantrip’s trial
testimony he blacked out and did not recall the events around the shootings.  As he suggests in his appellate brief, he
could have used these comments to undermine or impeach the State’s
psychologist.  Not only does this
evidence not qualify as newly discovered, but it is “merely cumulative,
corroborative, collateral, or impeaching.” 
Wallace v. State, 106 S.W.3d
103, 108 (Tex. Crim. App. 2003).[11]  It also reflects his condition after his
encounter with deputies, during which he was, himself, shot and rendered
unconscious.  We overrule Lantrip’s third
point of error.

(4)        At Trial, Lantrip Was Not Entitled to Be
Dressed, as He Chose, in Camouflage Clothing

 

            Lantrip
argues that the trial court erred in allowing him to wear jail-issued, orange
clothes during his jury trial.  Before
trial, Lantrip advised the trial court, “I want camouflage in court, Judge.  I wore prison white for 30 years, and I’ve decided
it’s camouflage from here on out.”  The
trial court said that wearing camouflage in the courtroom was not acceptable
and offered to provide Lantrip some of the judge’s own clothes.  Lantrip refused.[12]  Throughout trial, several witnesses
identified Lantrip with reference to his orange clothes.  

            Being
forced to appear at a jury trial in jail clothes may impinge on a defendant’s
presumption of innocence.  If he or she
does not wish to appear in such attire, it is incumbent on the defendant to
make a timely objection to the trial court. 
See Randle v. State, 826 S.W.2d 943, 945–46 (Tex. Crim. App. 1992).[13]  Lantrip made no such objection.  In fact, it was his clearly expressed
preference to wear the jail-issued outfit over civilian clothes.  Lantrip was free to make this decision.  See
Estelle v. Williams, 425 U.S. 501,
508 (1975) (“it is not an uncommon defense tactic to produce the defendant in
jail clothes in the hope of eliciting sympathy from the jury”).

            Lantrip
argues the trial court should have granted his preference, to be tried in
camouflage.  He offers no support for
this claim, other than arguing that camouflage is Lantrip’s preferred attire.  The trial court has discretion in the
administration of the courtroom in order to maintain a proper level of decorum
and dignity.  See Illinois v. Allen,
397 U.S. 337, 344–45 (1970); see also
Gonzales v. State, 2 S.W.3d 600, 607
(Tex. App.—Texarkana 1999, pet. ref’d) (“trial judge has the inherent power to
control the orderly proceedings in the courtroom”).  We cannot say the trial court abused its
discretion in not allowing Lantrip to wear camouflage clothing in the
courtroom.  See Johnson v. State, 838
S.W.2d 906, 909 (Tex. App.—Corpus Christi 1992, pet. ref’d) (“To hold otherwise
would require us to entertain the notion that the Due Process Clause or Art.
2.03(b) provide a defendant the right to appear before the jury in clothes of
his choice, and perhaps of a particular style.”).  We overrule this point of error.

            We
affirm the judgment of the trial court.

 

 

                                                                                    Josh
R. Morriss, III

                                                                                    Chief
Justice

 

Date Submitted:          January
12, 2011

Date Decided:             February
4, 2011

 

Publish











[1]Lantrip
testified that, when grocery shopping once a month, he would purchase ten
thirty-packs of beer.

 





[2]The
more complete story starts with two young people listening to music in a van,
near Lantrip’s house.  Randy Lamkin and a
friend, Katlan Maxwell, were sitting in Maxwell’s van, talking and listening to
music, on the afternoon of April 10, 2009. 
Lamkin lived with his mother and stepfather—the victim here, Gordon—across
the street from Lantrip.  Lamkin and
Maxwell were familiar with Lantrip, because Lamkin had done some yard work for
Lantrip.   Lantrip, carrying a shotgun
and appearing intoxicated, approached the young men and accused them of
preparing to burglarize Lantrip’s home.  When
Lantrip asked Lamkin and Maxwell if they were ready to die, they said they were
not.  In response, Lantrip said that he
was ready to die.  After a few minutes,
Lantrip let the two return to the Lamkin-Gordon house, but not before asking Lamkin
to take care of Lantrip’s dogs, because Lantrip had a feeling he was going to
die that day.  Lantrip also told the two not
to call the police.  Lamkin told his
parents about the incident; his mother was ready to call law enforcement, but
Gordon convinced her not to.

                A
short time later, Maxwell and Lamkin walked by Lantrip’s house on their way to
another neighbor’s; Lantrip again detained the young men, pointing the shotgun
at them.  Lamkin described Lantrip as “real
drunk.”   Gordon came out of his house
and told Lantrip to put the gun down. 
When Lantrip refused, Gordon said he would call the police and turned to
return to his house.  Lantrip then shot
Gordon in the back.  When Gordon tried to
get up, Lantrip shot him again.  Maxwell
ran off, and Lamkin began having an asthma attack, which led to a panic attack.
 Lantrip allowed Lamkin to go
inside.  By this point, Gordon’s wife,
Connie, had called the sheriff’s department. 
She ran to Gordon, as he lay in the road bleeding.  She testified Lantrip told her she would die
with her husband if she approached Gordon. 
A neighbor who happened to be driving by stopped his car between Gordon
and Lantrip, and Connie stayed with Gordon as he lay in the road.  

                Three
deputies arrived and Lantrip fired at them. 
One deputy shot Lantrip, rendering him unconscious.    Gordon was hospitalized, but died two weeks
later.  The medical examiner attributed
his death to the shotgun blast and ruled the cause of death as homicide.  

 





[3]In
a companion case, tried simultaneously with the instant case, Lantrip was found
guilty of two counts of attempted capital murder for shooting at Harrison
County deputies who arrived on the scene after Gordon had been shot.  Lantrip was assessed life sentences on all
three charges.  Lantrip has addressed
both trial court cases in a single brief, and the issues and facts in the two
cases are the same.  In his appeals of
all three convictions, Lantrip claims that he successfully proved he was
legally insane that night; that the trial court failed to adequately admonish him
before he testified; that his motion for new trial should have been granted;
and that the trial court erred in refusing to permit him to appear at trial in camouflage.  By our opinion issued today in the companion
appeal, regarding the convictions for attempted capital murder, we affirm that
case as well.  See Lantrip v. State, cause
number 06-10-00108-CR.

 





[4]If
the issue is submitted to the jury, the jury shall specify in its verdict
whether the defendant is guilty, not guilty, or not guilty by reason of
insanity.  Tex. Code Crim. Proc. Ann. art. 46C.151(b) (Vernon 2006).





[5]Judge
Cochran’s concurrence in Brooks v. State,
323 S.W.3d 893, 924 n.67 (Tex. Crim. App. 2010) (Cochran, J.,  concurring) suggests that the standard in Meraz is still the appropriate review
where a defendant had the burden of proof on an affirmative defense.  See
also Johnson v. State, No. 05-09-00133-CR,
2010 Tex. App. LEXIS 10051 (Tex. App.—Dallas Dec. 20, 2010, no pet. h.) (mem.
op., not designated for publication) (finding Meraz still applies post-Brooks
to review of affirmative defense).  We
cite Johnson not for any precedential
value, but simply note it as we continue to discover the post-Brooks landscape.  See
Brooks, 323 S.W.3d at 902, 912 (4-1-4
decision) (finding “no meaningful distinction” between the standards of review
in Jackson v. Virginia, 443 U.S. 307
(1979), for legal sufficiency of evidence, and that in Clewis v. State, 922 S.W.2d 126 (Tex. Crim. App. 1996), for factual
sufficiency of evidence).





[6]See also Taylor v. State, 856 S.W.2d 459, 468 (Tex. App.—Houston [1st Dist.]
1993), aff’d, 885 S.W.2d 154 (Tex.
Crim. App. 1994) (citing Graham v. State,
566 S.W.2d 941, 948 (Tex. Crim. App. 1978) (discussing difference between
medical and legal insanity)).

 





[7]Lantrip
continues this argument by referencing an earlier version of the Texas Probate
Code which included in the category of “persons of unsound mind,” inter alia, insane persons and those unable to manage their property and
financial affairs.  Tex. Prob. Code Ann. § 3(y) (enacted
54th Leg., ch. 55, eff. Jan. 1, 1956, repealed
by Act of May 27, 1995, 74th Leg., R.S., ch. 1039, § 73, 1995 Tex.
Gen. Laws 5145, 5170).  Just as we do not
find the current Probate Code controlling in Lantrip’s trial conducted under
the Texas Penal Code and Texas Code of Criminal Procedure, we do not find the fifty-year-old
version of the Texas Probate Code helpful.

 





[8]Lantrip
offers no authority to support an argument that the finding of disability and
that he needed a guardian fifty years ago is the equivialent of an adjudication
of insanity as contemplated by Texas caselaw. 
See Manning, 730 S.W.2d at 748.





[9]Lantrip
complains all the evidence of extraneous offenses would be considered by the
jury in its consideration of his guilt for the instant offenses.  Lantrip himself described in great detail his
several prior violent offenses committed over three decades in his testimony
under direct examination.  Obviously,
this was part of the risk of taking the stand, but the fact that the evidence
was presented does not create a duty on the part of the trial court where none
exists.





[10]The
State urges us to overrule Lantrip’s point of error as inadequately
briefed.  In his brief, Lantrip does not
cite the above law regarding motions for new trial.  Nor does he cite Article 40.001 of the Texas
Code of Criminal Procedure  stating a new
trial shall be granted where material evidence, favorable to a defendant, has
been discovered since trial; nor does Lantrip cite Rule 21.3 of the Texas Rules
of Appellate Procedure.  Tex. Code Crim. Proc. Ann. art. 40.001;
Tex. R. App. P. 21.3.  An appellant’s brief “must contain . . .
appropriate citations . . . to the record.”  Tex.
R. App. P. 38.1(h).  Nonetheless, we will, in the interest of
justice, review whether Lantrip showed himself entitled to a new trial.





[11]Nor
can it be said these comments from the emergency room doctor render the
“verdict [] contrary to the law and the evidence.”  Tex.
R. App. P. 21.3(h).  At most, the
proffered comments are cumulative of the trial testimony or would be used to
impeach Dr. Allen’s expert testimony.





[12]After
this brief hearing, during which the trial court threatened Lantrip with
contempt of court and then found him in contempt of the court’s order, the
court ordered Lantrip returned to the holding cell.  No reference was made to the contempt holding
or to Lantrip’s appearing in the orange jail clothes.

 





[13]See also Wickware v. State, 486 S.W.2d 801, 804–05 (Tex. Crim. App. 1972)
(affirming trial court’s judgment when appellant failed to object to being
tried in jail clothes and noting that he could not “remain silent and then
claim error for the first time on appeal”); Barber
v. State, 477 S.W.2d 868, 870 (Tex. Crim. App. 1972) (affirming trial court’s
judgment when record failed to reflect that appellant was in jail uniform
during voir dire and no objection made to being in jail clothes).