COURT OF APPEALS









COURT
OF APPEALS

EIGHTH
DISTRICT OF TEXAS

EL
PASO, TEXAS

 

YJINIO GALINDO,                                             )

                                                                              )              
No.  08-02-00341-CR

Appellant,                          )

                                                                              )                    Appeal from the

v.                                                                           )

                                                                              )                
168th District Court

THE STATE OF TEXAS,                                     )

                                                                              )            
of El Paso County, Texas

Appellee.                           )

                                                                              )                 
(TC# 990D02695)

                                                                              )

 

 

O
P I N I O N

 

Appellant Yjinio
Galindo was charged by indictment with the offenses of attempted murder with a
deadly weapon and aggravated assault with a deadly weapon.  A jury found Appellant guilty of aggravated
assault with a deadly weapon and assessed punishment at 16 years= and 9 months=
imprisonment in the Institutional Division of the Texas Department of Criminal
Justice.  On appeal, Appellant raises
three issues, in which he argues that the trial court erred in denying his
motion to suppress evidence, in admitting evidence of his post-arrest silence,
and he also contends the evidence was factually insufficient to disprove his
affirmative defense of insanity.  We
affirm.








FACTS

On April 22, 1999,
Maria del Carmen Aranda was working at the YMCA in El Paso.  That morning, Ms. Aranda accompanied a pest
control worker upstairs to open the rooms for fumigation.  When they reached room 428, Ms. Aranda
knocked on the door twice and identified herself and the worker as Apest control.@  Appellant opened the door.  Ms. Aranda recalled that Appellant gave her a
Avery penetrating look like he was
bothered . . . .@  Appellant left the room.  The pest control worker stayed in the room
about two minutes or less while fumigating it. 
After they finished fumigating, Ms. Aranda saw complainant Maria
Guadalupe Rodriguez, another YMCA employee, exiting the elevator.  They spoke to each other for a while before
Ms. Aranda left to check on laundry in the laundry room.

Ms. Rodriguez was
working in the men=s rest
room on the second floor when a man walked in the room.  The man, who Ms. Rodriguez identified as
Appellant, grabbed her by the neck and pushed her against the shower wall.  Ms. Rodriguez=s
head struck the frame of the shower. 
While still holding her neck, Appellant lifted his shirt and took out a
knife.  Appellant then began to stab Ms.
Rodriguez on the left side of her chest. 
Appellant also cut her finger. 
Ms. Rodriguez was stabbed five times in the chest.  When blood squirted on his face and on his
shirt, Appellant let go of Ms. Rodriguez=s
neck.  Ms. Rodriguez was able to slip
down the wall and escape.  As she ran
away, she saw Appellant taking the elevator. 
Ms. Rodriguez ran downstairs to the front desk.  The front desk employee yelled for Ms.
Rodriguez=s
supervisor.  The supervisor brought over
three towels to cover her and an ambulance arrived shortly.  








That same morning,
Officer John Wasmuth and his partner Officer Fred Hernandez were working
plainclothes surveillance and were parked in the rear parking lot of the
YMCA.  They received a radio dispatch
about a stabbing at the YMCA and responded to the call.  When they arrived, they observed Sergeant
Archer, several people standing around in the lobby, and a woman laying on the
ground with her shirt torn open and blood on her upper torso.  Based on information received from the victim
about what had taken place, they proceeded to the laundry room in the basement
to find Ms. Aranda.  Ms. Aranda told them
that she had not seen anyone down there. 
They, including Ms. Aranda, went back upstairs to the first floor.  After talking to Ms. Rodriguez, Ms. Aranda and
the officers went upstairs to the fourth floor to room 428.  

According to
Officer Wasmuth, when they reached room 428, Officer Hernandez tapped on the
door, but there was no response.  Officer
Hernandez asked Ms. Aranda for the key and she gave it to him.  The officer placed the key into the tumbler
of lock, but as he started to turn the knob, the door opened.  Appellant was inside standing close to the
door.[1]  Officers Wasmuth and Hernandez identified
themselves as police officers and displayed their badges.  Either Officer Wasmuth or Officer Hernandez
drew his firearm and pointed it at Appellant. 
Officer Hernandez entered the room, placed his hands on Appellant=s right arm, and told Appellant to
place his hands against the wall and not to move.  Officer Hernandez handcuffed Appellant and
escorted him out of the room.








Officer Wasmuth
testified that Appellant was detained and searched for any weapons.  The officers found a large knife encased in a
sheath on Appellant=s left
hip.  Officer Wasmuth took the knife from
Appellant=s
person.  The knife was bloody around the
hilt.  Appellant was then escorted
downstairs by elevator to the first floor. 
The officers advised Sergeant Archer that they had the subject in
custody and had recovered the weapon.  At
the scene, Ms. Rodriguez identified Appellant as her assailant.

Ms. Aranda
testified that the YMCA provides about 120 rooms for housing individuals.  Ms. Aranda knew Appellant on a first name
basis.  Ms. Rodriguez testified that she
did not know Appellant=s
name at the time of the attack.  During
her testimony, Ms. Rodriguez recalled that Appellant had been living at the
YMCA since November 1998.  Once in
November, she and her supervisor, Ms. Aranda, entered Appellant=s room. 
Ms. Rodriguez stated that Ms. Aranda was showing her how to clean rooms
and when Appellant returned and found them there he was very friendly.  Ms. Rodriguez did not have any problems with
Appellant between November 1998 and April 22, 1999.  About three days before the stabbing, she had
an encounter with Appellant, in which he confronted her and asked why she went
into his room without authorization. 
Ms. Rodriguez agreed that it did not make sense for Appellant to
attack her with a knife just because she went into his room without permission
five months earlier.

DISCUSSION

Motion
to Suppress








In Issue One,
Appellant argues that the trial court erred in denying his motion to suppress
tangible evidence because it was obtained in violation of his Fourth Amendment
and his state Article 1, section 9 constitutional right, prohibiting
unreasonable search and seizure.  On
appeal, Appellant argues that the knife was obtained pursuant to an unlawful
search and seizure.  Specifically, he
asserts that the State provided no statutory exception to the warrant
requirement, there was no evidence of exigent circumstances to justify the
warrantless search of his residence, no probable cause for the officers= entry into his room, no specific facts
conveyed to the police prior to their entry, and that the State failed to
establish an immediate need to search and arrest him.

Standard
of Review

We review a trial
court=s denial
of a motion to suppress for an abuse of discretion. Villarreal v. State,
935 S.W.2d 134, 138 (Tex.Crim.App. 1996). 
In a motion to suppress hearing, the trial judge is the sole trier of
fact and judge of the credibility of the witnesses, including what weight, if
any, is to be given to their testimony.  Romero
v. State, 800 S.W.2d 539, 543 (Tex.Crim.App. 1990).  Consequently, the reviewing court must defer
to the trial court=s
determination of historical facts supported by the record, especially when the
trial court=s
findings are based on an evaluation of credibility and demeanor, and review the
court=s
application of search and seizure law de novo.  Balentine v. State, 71 S.W.3d 763, 768
(Tex.Crim.App. 2002); Guzman v. State, 955 S.W.2d 85, 88-9
(Tex.Crim.App. 1997).  As the trial court
made no explicit findings of historical facts in this case, the evidence must
be reviewed in a light most favorable to the trial court=s
ruling.  Balentine, 71 S.W.3d at
768.  We review de novo the trial
court=s
conclusions of law and the application of those principles to the facts which
do not turn on an evaluation of credibility and demeanor.  Guzman, 955 S.W.2d at 89.  The trial court=s
ruling will be upheld if it is reasonably supported by the record and is
correct on any theory of law applicable to the case.  State v. Ross, 32 S.W.3d 853, 855-56
(Tex.Crim.App. 2000).

Illegal
Arrest








At trial,
Appellant requested a suppression hearing regarding the officers= entry into his room without a
warrant.  Outside the jury=s presence, Officer Wasmuth testified
that within a few minutes of hearing the dispatch call, they were in the YMCA
building in front of room 428.[2]  Ms. Aranda gave Officer Hernandez the
key to the room.  As Officer Hernandez
was turning the door, the door was opened from the inside.  According to Officer Wasmuth, Officer
Hernandez did not open the door because as he started to turn the door, it came
open.  Appellant was at the door and had
it completely open.  The officers
identified themselves as police officers and showed their badges.  Officer Hernandez stepped into the room and
took Appellant by the right arm and instructed Appellant to put his hands
against the wall and not to move. 
Officer Hernandez then handcuffed Appellant and retrieved a large knife
from the sheath connected to his belt on his left side.  After hearing this additional testimony from
Officer Wasmuth, the trial court denied Appellant=s
motion.  Appellant obtained a running
objection on all evidence obtained pursuant to the police officers= conduct.

The Fourth
Amendment to the United States Constitution and Article I, sec. 9 of the Texas
Constitution guarantee the right to be secure from unreasonable searches and
seizures.  See U.S. Const. Amend. IV; Tex.Const. art. I, ' 9. 
When a defendant seeks to suppress evidence on the basis of a Fourth
Amendment violation, he bears the initial burden of rebutting the presumption
that police conduct was proper.  Russell
v. State, 717 S.W.2d 7, 9 (Tex.Crim.App. 1986).  The defendant rebuts this presumption by
showing that the search or seizure occurred without a warrant.  Id. 
If the State conducted a search or seizure without a warrant, the burden
shifts to the State to prove that the warrantless search or seizure was
reasonable.  See id. at 9-10.








The record in this
case reflects that Appellant was taken into custody and searched without a
warrant.  Moreover, the State in its
brief concedes that the officers entered Appellant=s
room to effectuate a warrantless arrest. 
The State contends, however, that the officers made a valid warrantless
arrest because:  (1) Appellant committed
an offense within the officer=s
presence or within view; (2) Appellant was found in a suspicious place and
under circumstances that reasonably show he was guilty of a felony; and (3) a
felony had been committed and Appellant was about to escape.[3]

Generally, an
arrest or search without a valid arrest warrant is unreasonable.  Wilson v. State, 621 S.W.2d 799,
803-04 (Tex.Crim.App. 1981).  State law,
not federal law, governs the legality of a state arrest so long as that law
does not violate federal constitutional protections against unreasonable
searches and seizures.  Amores v.
State, 816 S.W.2d 407, 413 (Tex.Crim.App. 1991).  In Texas, warrantless arrests are authorized
only in limited circumstances.  Id.  An officer is allowed to make a warrantless
arrest only if (1) the officer has probable cause, and (2) the arrest falls
within an exception listed in Chapter 14 of the Texas Code of Criminal
Procedure.  Stull v. State, 772
S.W.2d 449, 451 (Tex.Crim.App. 1989); see also Tex.Code Crim.Proc.Ann. arts. 14.01-14.04 (Vernon 1977 &
Supp. 2004-05).








The reviewing
court looks at the totality of the circumstances to determine probable cause
for a warrantless search and seizure.  Torres
v. State, 868 S.W.2d 798, 801 (Tex.Crim.App. 1993).  Probable cause to arrest exists where the
facts and circumstances within the officer=s
knowledge and of which he has reasonably trustworthy information are sufficient
in themselves to warrant a person of reasonable caution to believe that a
particular person has committed or is committing an offense.  Amores, 816 S.W.2d at 413.  In reviewing a warrantless arrest to
determine the existence of probable cause, we look to the objective facts known
to the officers at the time of the arrest, not subsequently discovered facts or
later‑acquired knowledge that bolster the claim of probable cause.  Id. at 415; Torres, 868 S.W.2d
at 801.

The record
reflects that the arresting officers knew the following information:  (1) someone had been stabbed at the YMCA; (2)
when they arrived, the officers observed the victim and she told them what had
taken place; and (3) Ms. Aranda talked to the victim and then took the officers
to room 428.  In its brief, the State
also asserts that the officers saw that Appellant had a large knife in a sheath
attached to his belt when he opened the door. 
However, Officer Wasmuth=s
testimony indicates that they saw Appellant when he opened the door from the
inside, but found the knife on Appellant=s
person only after Appellant was detained and searched for weapons.  Therefore, the knife was later discovered
evidence which cannot support the officers=
probable cause to arrest Appellant.  In
the record before us, there is no testimony regarding the additional facts and
circumstances obtained from the victim or Ms. Aranda, which would have lead the
officers to identify Appellant as the particular person who committed the
offense.  See Amores, 815
S.W.2d at 415 (the reviewing court will not engage in conjecture as to the
existence of facts which are critical to a probable cause finding, rather the
facts and circumstances must be specifically articulated in record).  








The State had the
burden to prove the existence of probable cause to justify the warrantless
arrest.  Amores, 816 S.W.2d at
414.  A failure of proof on any fact
essential to a finding of probable cause is construed against the State.  Id. at n.11.  We conclude that based on the record in this
case, the State failed to show probable cause existed at the time of Appellant=s arrest.  The knife and related evidence were seized as
a result of an unlawful arrest and therefore was illegally obtained and should
have been suppressed.[4]








Having found
error, we must now conduct a harm analysis. 
See Tex.R.App.P.
44.2(a); Villalobos v. State, 999 S.W.2d 132, 136 (Tex.App.--El Paso
1999, no pet.).  Appellant=s right to be free from an unreasonable
seizure is of constitutional dimension, therefore, we must reverse unless the
record establishes beyond a reasonable doubt that admission of the knife into
evidence did not contribute to Appellant=s
conviction or punishment.  See
Villalobos, 999 S.W.2d at 136.  In
applying a harm analysis, we should not determine the harmfulness of an error
simply by examining whether there exists overwhelming evidence to support the
defendant=s
guilt.  Harris v. State, 790
S.W.2d 568, 587 (Tex.Crim.App. 1989). 
Rather, we should calculate as much as possible the probable impact of
the error on the jury in light of the existence of the other evidence.  Id. 
When making this determination, we consider:  (1) the source of the error; (2) nature of
the error; (3) whether, or to what extent, it was emphasized by the State; (4)
the probable collateral implications of the error; (5) the probable weight
placed on the error by the jury; and (6) whether declaring the error harmless
would encourage the State to repeat it with impunity.  See Harris, 790 S.W.2d at
587.  In Harris, the Court of
Criminal Appeals outlined the procedure for reaching this determination as
follows:  (1) to Aisolate
the error and all its effects, using the considerations set out above and any
other considerations suggested by the facts of an individual case;@ and (2) to Aask
whether a rational trier of fact might have reached a different result if the
error and its effects had not resulted.@  Id. at 588.  








Applying the above
Harris factors to this case and considering the overwhelming evidence of
guilt as a factor, we conclude beyond a reasonable doubt that the error did not
contribute to Appellant=s
conviction or punishment.  Ms. Rodriguez
identified Appellant as her assailant and testified that he pulled out a knife
and stabbed her repeatedly before she was able to escape.  Photographs of her stab wounds were admitted
into evidence without objection.  Ms. Rodriguez
also testified to the protracted loss of use of her hand due to the
stabbing.  Detective Ernest Wade observed
and photographed a trail of blood, leading from the second floor to the first
floor.  Blood swabs taken from the
bathroom doorjamb and the floor matched Ms. Rodriguez=s blood test sample.  The source of the error was the State, but
there is nothing in the record to indicate it was attempting to taint the trial
by offering inadmissible evidence.  See
Harris, 790 S.W.2d at 588.  The State
made only a few remarks about the knife in its closing arguments and these
remarks were limited to testimony that was relevant for a deadly weapon
finding.  The probable collateral
implications of the error were minimal given Appellant=s
asserted defense of insanity, which was not disparaged by the inadmissible
evidence.  Since the victim testified in
detail about her attack and Appellant=s
use of a knife in the assault, the probable weight placed on the error by the
jury was most likely minimal.  Finally,
we find that holding this error harmless based on the particular facts of this
case, will not foster repetition of the error with impunity.

After carefully
reviewing the record in light of the Harris factors, we are certain that
a rational trier of fact would not have reached a different result if the error
and its effects had not resulted.  See
Harris, 790 S.W.2d at 588. 
Accordingly, we find beyond a reasonable doubt that the alleged error
did not contribute to Appellant=s
conviction or punishment and admission of the complained-of evidence was
therefore harmless.  See Tex.R.App.P. 44.2(a).  Issue One is overruled.

Post-Arrest
Silence

In his second
issue, Appellant argues that the trial court erred in admitting evidence of his
post-arrest silence.  Specifically,
Appellant asserts that the trial court admitted evidence that he remained
silent after Ms. Aranda spoke to him, which violated his due process rights
under the federal and Texas constitutions privileges against
self-incrimination.  The accused has a
right to remain silent when arrested, and the exercise of that right may not be
used against the defendant as a circumstance tending to show guilt.  See Sanchez v. State, 707 S.W.2d 575,
578-80 (Tex.Crim.App. 1986).  A comment
on a defendant=s
post-arrest silence violates the defendant=s
due process right to be free from self-incrimination.  U.S.
Const. amend. V; Tex.Const.
art. I, ' 10; see
Doyle v. Ohio, 426 U.S. 610, 618-19, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91
(1976); Dinkins v. State, 894 S.W.2d 330, 356 (Tex.Crim.App. 1995).








During Ms. Aranda=s testimony, she stated that after the
officers handcuffed Appellant and found the knife, she asked Appellant, Awhy he had done that to my friend.@ 
Defense counsel objected under Article 38.22 and Miranda because
Appellant was in custody.  The trial
court sustained the objection.  The State
requested a hearing outside the jury=s
presences to determine the admissibility of Ms. Aranda=s
testimony.  In voir dire, the following
exchange occurred:

The
State:         What happened when the
Defendant was first taken out of the room?

 

Ms.
Aranda:     What happened?  They took the knife or the blade from him.

 

The
State:         And then what happened?

 

Ms.
Aranda:     That was when I told him that
why he had done that to my friend.

 

The
State:         What did he say when you
asked him that?

 

Ms.
Aranda:     No. he didn=t answer at all.

 

The
State:         And then what happened.

 

Ms.
Aranda:     He told me in English that he
was looking for me. 

 

The State argued that the testimony
was admissible because Appellant=s
responses were Ares
gestae@
statements at the time he was placed into custody and that as a lay witness,
Ms. Aranda=s
statement was not a custodial interrogation. 
Defense counsel argued that since Appellant was silent when asked the
question, he objected on the basis of post-arrest silence.  The trial court again sustained the
objection.








During
cross-examination of Ms. Aranda, the trial court sua sponte reconsidered
its ruling regarding the statement Appellant made to Ms. Aranda.  Defense counsel obtained a running objection
to Ms. Aranda=s
testimony on this subject.  In redirect
examination, Ms. Aranda testified that she asked Appellant why he had done that
to her friend and in response, A[h]e
remained quiet for a while and then he told me that he was looking for me.@ 
After that exchange, they went downstairs by elevator.

It is undisputed
that Appellant was in police custody when Ms. Aranda questioned Appellant and
the State concedes that Appellant was under arrest.  The State=s
inquiry, however, did not constitute a comment on Appellant=s post-arrest silence.  Ms. Aranda=s
testimony indicates that rather than remaining silent, Appellant answered her
question.  The evidence suggests that the
period during which Appellant Aremained
quiet for a while@ before
responding to the question was momentary, therefore we conclude the trial court
did not err in admitting Ms. Aranda=s
testimony about Appellant=s
post-arrest statement.  Issue Two is
overruled.

Insanity
Defense

In Issue Three,
Appellant contends the evidence was factually insufficient to disprove his
affirmative defense of insanity. 
Specifically, he asserts that the jury=s
rejection of his insanity defense was against the great weight and
preponderance of the evidence, in this case, testimony by Dr. Mariam Marvasti.

Standard
of Review








In examining the
factual sufficiency of the evidence supporting an insanity defense, we consider
all evidence relevant to the issue and determine whether the jury=s implied finding against the
affirmative defense is so against the great weight and preponderance of the
evidence as to be manifestly unjust.  Bigby
v. State, 892 S.W.2d 864, 875 (Tex.Crim.App. 1994); Meraz v. State,
785 S.W.2d 146, 155 (Tex.Crim.App. 1990). 
The question on appeal is whether the jury could have determined that
the defendant failed to proved the defense of insanity by a preponderance of
the evidence.  Love v. State, 909
S.W.2d 930, 943 (Tex.App.--El Paso 1995, pet. ref=d).  Ultimately, this issue lies within the
province of the jury, not only as to the credibility of the witnesses and
weight of the evidence, but also as to the limits of the defense itself.  Bigby, 892 S.W.2d at 878; Graham v.
State, 566 S.W.2d 941, 952 (Tex.Crim.App. 1978); Love, 909 S.W.2d at
943.  The jury=s
decision will be overturned only where the fact issue is undisputed or resolved
to one end of the spectrum and that fact determination is found to lie outside
the realm of discretion.  Bigby,
892 S.W.2d at 878; Graham, 566 S.W.2d at 952 n.3; Love, 909
S.W.2d at 943.  

Legal
Insanity

Under the
affirmative defense of insanity, a defendant cannot be convicted of a criminal
offense if he is legally insane at the time of crime.  See Tex.Pen.Code
Ann. ' 8.01
(Vernon 2003); Dashield v. State, 110 S.W.3d 111, 113 (Tex.App.--Houston
[1st Dist.] 2003, pet. ref=d).  To establish an insanity defense, the
defendant must prove by a preponderance of the evidence that at the time of the
offense, he, as a result of severe mental disease or defect, did not know that
his conduct was wrong.  See Tex.Pen.Code Ann. '' 8.01, 2.04(d)(Vernon 2003); Aschbacher
v. State, 61 S.W.3d 532, 535 (Tex.App.--San Antonio 2001, pet. ref=d). 
At trial, the defendant has both the burden of proof and the burden of
persuasion.  Meraz, 785 S.W.2d at
155.  The purpose of the insanity defense
is to determine whether the defendant should be held responsible for the crime,
or whether a mental condition excuses him from such responsibility.  Graham, 566 S.W.2d at 948.








Proof of a mental
disease or defect alone is not sufficient to establish legal insanity.  Schuessler v. State, 719 S.W.2d 320,
329 (Tex.Crim.App. 1986)(en banc), overruled on other grounds, Patel
v. State, 787 S.W.2d 410, 411 (Tex.Crim.App. 1990); Graham, 566
S.W.2d at 943.  Medically, an individual
may be insane from a mental disease or defect yet, legally, he is not relieved
of the criminal responsibility for that crime unless his mental condition
reached the point where he was unable to distinguish right from wrong and to
know the nature and consequence of his act. 
Graham, 566 S.W.2d at 949; Love, 909 S.W.2d at 943.  The insanity defense invokes legal and ethical
considerations beyond the medical condition. 
Bigby, 892 S.W.2d at 877-78; Graham, 566 S.W.2d at
948-49.  Thus, in determining the
ultimate issue of sanity, the jury is called upon to join the non-medical
components that must be considered in deciding the ultimate issue.  Bigby, 892 S.W.2d at 878; Graham,
566 S.W.2d at 949.  Expert witnesses,
although capable of giving testimony that may aid the jury in determining the
issue, do not dictate the result.  Graham,
566 S.W.2d at 948-49.  The circumstances
of the crime are always important in determining the mental state of the
accused at the time of the offense, therefore, the trier of fact may consider
such evidence as lay testimony regarding the defendant=s
demeanor before and after the offense, attempts to conceal incriminating
evidence, attempts to evade police, expressions of regret or fear of the
consequences of his actions, and other possible motives for the offenses or explanations
for his behavior.  Graham, 566
S.W.2d at 951; Reyna v. State, 116 S.W.3d 362, 368 (Tex.App.--El Paso
2003, no pet.).

Insanity
Defense Evidence








Defense witness
Dr. Mariam Marvasti, a psychiatrist, testified that she examined Appellant on
seven different occasions after the offense. 
Dr. Marvasti prescribed an antipsychotic medication, Mellaril, to
Appellant and later changed that prescription to Risperdal, a newer generation
antipsychotic medication.  Based on her
review of Appellant=s medical
records from Dr. C. Wright Anderson, Appellant=s
previous psychiatrist in California, Dr. Marvasti stated that Appellant is
sixty-five years old and his mental illness started in the mid-to late >70s. 
Dr. Anderson first saw Appellant in August 1981 after Appellant was
discharged from an inpatient psychiatric hospital in California.  Dr. Anderson was Appellant=s psychiatrist from 1981 to 1997.  Dr. Anderson diagnosed Appellant with
paranoid schizophrenia, chronic type, and prescribed Mellaril.  Dr. Marvasti agreed with that diagnosis.  She explained that paranoid schizophrenia,
chronic type, means that a person suffers a chronic psychotic disorder,
characterized by hallucinations, delusions, or thought process disorder, such
as loosening of association, that is, the person does not make sense when he
talks and does not show emotion.

In addition to
Appellant=s medical
records, Dr. Marvasti reviewed the county jail records and the police report
from the incident and interviewed the arresting officer.  Dr. Marvasti also reviewed Appellant=s emergency room records from
Providence Memorial Hospital, which indicated he had complained of feeling
depressed and nervous and was prescribed Mellaril a couple of weeks before the
incident.[5]  Based on reasonable medical certainty, Dr.
Marvasti concluded that Appellant was insane at the time of the offense because
he was suffering from schizophrenia. 
According to Dr. Marvasti, Appellant was under the delusion of believing
that everyone was against him, especially two perople, one of whom was the one
who was assaulted.  Dr. Marvasti
explained that Appellant believed and still believes that Ms. Rodriguez was
snooping around and she and the person she brought into the hall were talking
about him and were against him.  








On
cross-examination, Dr. Marvasti conceded that chronic paranoid schizophrenia is
a mental disease and that a person can have a mental disease and be sane at the
time of an offense.  In total, Dr.
Marvasti spent approximately nine and a half hours examining Appellant over the
course of their meetings.  Dr. Marvasti
stated that during their interviews Appellant told her that the maids were
harassing him, opening closets, and snooping around.  Appellant told them not to come into his room
anymore and that he would clean his own room. 
He saw them talking to a guy in the corridor who he thought they had
brought to harass him.  When they were in
the hall talking loud, he got angry and went out and attacked him.  While Dr. Marvasti agreed that a chronic
paranoid schizophrenic can get angry, act out of anger, and not be insane, she
noted that a person suffering from the condition has anger out of proportion to
the situation.  In her opinion, if the
person is acting out of his paranoid delusions, then he does not know the difference
between right or wrong.  Dr. Marvasti
believed that if Appellant knew the difference between right and wrong and was
sane, he would have run away from the YMCA instead of sitting in his room.  Dr. Marvasti conceded that Appellant was not
hearing voices, not under any hallucinations, and not seeing things at the time
of the offense.  However, he was under
the delusion that the maids were harassing him.








The State called
Dr. Arthur Ramirez, a psychiatrist, as a rebuttal witness.  Dr. Ramirez conducted an initial evaluation
in February 2000.  At the time, Appellant
was being treated with antipsychotic medication by Dr. Marvasti.  Appellant denied any previous psychiatric
hospitalizations, but recalled being evaluated by other psychiatrists.  Appellant denied having any medical illnesses.  Dr. Ramirez noted that in the mental status
examination, Appellant was very cooperative, answered all his questions, his
thought processes indicated he was thinking very clearly at the time, and he
had no delusional symptoms.  During the
evaluation, Appellant told Dr. Ramirez that he stabbed the woman because she
was bothering him.  Appellant told
Dr. Ramirez that at the time of the offense, people were trying to hurt
him.  Dr. Ramirez stated that Appellant
told him that he felt very nervous around people.  Further, Dr. Ramirez observed that Appellant
had no hallucinations, was oriented, his concentration and overall fund of
knowledge was normal, he did not show any signs of mental retardation, and
showed no symptoms of depression.  Dr.
Ramirez=s
diagnostic impression at that point was the possibility of an atypical
psychosis with prominent paranoid features in the residual phase, meaning
Appellant had begun to respond to treatment. 


After his initial
evaluation, Dr. Ramirez reviewed police reports and prepared an addendum report
in April 2000.  Based on his review of
the reports, Dr. Ramirez did not believe there was any clinical evidence to
support the claim that Appellant was insane at the time of the offense.  Dr. Ramirez testified that Appellant has a
psychotic process and may even have schizophrenia, however, it was his opinion
that Appellant was not impaired to the degree that he could not tell right from
wrong or could not conform his behavior to the requirements of the law.  Dr. Ramirez believed that Appellant had the
capacity to distinguish right from wrong and the ability to make reasonable
decisions.  








In response to a
hypothetical question, Dr. Ramirez opined that if a man stabs a woman in a
public restroom on the second floor and then goes to his room on the fourth
floor and wipes away blood from his face, that person knows right from
wrong.  Dr. Ramirez explained that if a
person knew he did something wrong, he would try to change things, by wiping
blood off his face or clothes, because he does not want someone to know
something happened.  This would be
contrary to a person who does not have enough decision-making ability to do
such things or even leave the scene of the crime.  Dr. Ramirez considered going from the second
floor to the fourth floor to be leaving the scene of the crime.  Dr. Ramirez=s
concluded that Appellant knew his conduct, stabbing Ms. Rodriguez, was wrong
and in his opinion, Appellant was legally sane at the time of the offense.

During
cross-examination, Dr. Ramirez conceded that he had not reviewed Appellant=s prior medical records from California
nor was he aware that Appellant had been treated by Dr. Anderson in
California for many years.  Dr. Ramirez
was also not aware that Appellant had been treated at Providence Hospital
shortly before the incident.  Dr. Ramirez
agreed that Mellaril and Risperdal were antipsychotic medications used to treat
paranoid schizophrenia.  Dr. Ramirez
admitted that when he examined Appellant he was under Dr. Marvasti=s care and on medication.  Dr. Ramirez stated that he would agree with
the diagnosis that Appellant suffers from paranoid schizophrenia.  However, Dr. Ramirez maintained that moving
from one floor to the other was indicative of Appellant knowing right from
wrong and his capacity to conform to the requirements of the law.  Further, Dr. Ramirez stated that wiping or otherwise
riding oneself of blood is some evidence that a person knows he has done
something wrong.  








On redirect
examination, Dr. Ramirez stated that Appellant was not hallucinating nor
hearing voices at the time of the offense. 
Appellant told Dr. Ramirez that at the time of the incident he felt
uneasy about his room being sprayed for insects and roaches and Dr. Ramirez
observed a lot of referential-thinking on Appellant=s
part.  Dr. Ramirez agreed that a chronic
paranoid schizophrenic can act out of anger and still be sane.  According to Dr. Ramirez, if a chronic
paranoid schizophrenic was attempting to obtain medication it indicated to him
that the person had enough insight and judgment to take medications to stay
better and he responded to treatment. 
Those circumstances did not indicate a case of someone who is so Aflorally psychotic@ or ill because those kinds of patients
never go and get their medications and became more ill.  Dr. Ramirez did not believe it was
necessary to review Appellant=s
prior medical records in forming his opinion because Appellant had a clear
history of mental illness and was struggling with medications to process
things.  Dr. Ramirez did not dispute that
Appellant has a mental illness, but he did not believe that Appellant did not
know his conduct was wrong due to his mental illness nor did he believe all
people with mental illness are insane.

In addition to the
expert testimony, there was lay testimony from Ms. Aranda, in which she
recalled that when Appellant opened his door for pest control, he gave her a
very penetrating look like he was bothered, and then left his room.  On cross-examination, Ms. Aranda again
demonstrated the way Appellant was looking at her, and the record reflects that
Ms. Aranda squinted or furrowed her eyebrows. 
Ms. Aranda described the look as unnatural and abnormal and she thought
that Appellant did appear to be right in his mind to her.  On redirect, Ms. Aranda explained that
by his look, she though he was going to do something to her.  Over Appellant=s
objection, Ms. Aranda also testified that when she asked Appellant why he had
done what he did to her friend, he was quiet for a while and then told her that
he was looking for her.

Analysis

On appeal,
Appellant asserts the jury=s
rejection of his insanity defense was against the great weight and
preponderance of the evidence. 
Specifically, Appellant contends the State=s
evidence was not sufficient to rebut his evidence of insanity and that the
State was unable to establish that he knew his conduct was wrong.  We disagree.








The expert
witnesses in this case offered conflicting testimony regarding Appellant=s legal sanity.  Dr. Marvasti concluded that Appellant suffers
from chronic paranoid schizophrenia and was insane at the time of the
offense.  Based on her interviews with
Appellant, Dr. Marvasti determined that Appellant was under the delusion that
the maids were harassing him.  According
to Dr. Marvasti, if a person is acting out of his paranoid delusions, then he
does not know the difference between right and wrong.  Dr. Marvasti opined that if Appellant knew
the difference between right and wrong and was sane, he would have run away
from the YMCA instead of sitting in his room. 
Dr. Ramirez, however, agreed with Dr. Marvasti=s
diagnosis, but in his opinion there was no clinical evidence to support the
claim that Appellant was insane at the time of the offense.  Dr. Ramirez did not believe Appellant was so
impaired that he could not tell right from wrong or could not conform his
behavior to the requirements of the law. 
He also believed going from the second floor to one=s room on the fourth floor and wiping
blood from one=s face
indicated the person knew he did something wrong.[6]  Dr. Ramirez concluded that Appellant knew his
conduct was wrong and was legally sane at the time of the offense.  After reviewing the evidence in the record,
we find that the fact issue was not undisputed and not resolved to one end of
the spectrum nor is the implicit finding beyond the realm of the jury=s discretion.  See Love, 909 S.W.2d at 943.  Accordingly, we conclude that the jury=s rejection of Appellant=s insanity defense was not so against
the great weight and preponderance of the evidence as to be manifestly
unjust.  Issue Three is overruled.








For the reasons
stated above, we affirm the trial court=s
judgment.

 

 

August
26, 2004

DAVID WELLINGTON
CHEW, Justice

 

Before Panel No. 3

Barajas, C.J., Larsen, and Chew, JJ.

 

(Do Not Publish)











[1]
Ms. Aranda testified that she took the officers to open Appellant=s room. 
After she gave the officer the key, however, the officer, not Appellant,
opened the door.  She recalled that
Appellant was about two feet away from the door.  She also stated that the officers told
Appellant Ato go out
with his hands up.@





[2]
Officer Wasmuth stated that only a matter of seconds would have lapsed between
the time the department=s
call taker received the emergency call and the time of dispatch.  





[3]
Specifically, the State relies on the following three provisions set forth in
Chapter 14 of the Texas Code of Criminal Procedure:  Article 14.01(a),which authorizes a
warrantless arrest for an offense committed in the peace officer=s presence or within his view; Article
14.03(a)(1), which authorizes a warrantless arrest of Apersons
found in suspicious places and under circumstances which reasonably show that
such persons have been guilty of some felony;@
and Article 14.04, which authorizes a warrantless arrest A[w]here it is shown by satisfactory
proof to a peace officer, upon the representation of a credible person, that a
felony has been committed, and that the offender is about to escape . . . .@ 
See Tex.Code
Crim.Proc.Ann. arts. 14.01, 14.03(a)(1), and 14.04 (Vernon 1977 &
Supp. 2004-05).





[4]
In Appellant=s brief,
it appears that he is also challenging other related admitted evidence such as
the sheath, photographs of Appellant, and his clothing.  At trial, Appellant objected to Aall evidence obtained pursuant to this
[police] conduct.@  Appellant also objected to admission of
photographs of Appellant, the sheath, and his clothing on the ground that Athey were obtained pursuant to unlawful
arrest and unlawful search and seizure.@  The record shows that Appellant raised the
same objection to admission of the knife and related evidence.  Therefore, we conclude that the above
complained-of evidence ,which was obtained as a result of the unlawful arrest,
should have been suppressed.





[5]
Dr. Marvasti explained that Appellant was going back and forth to the emergency
room, complaining that he was Anervous@ and asking for medicine.  Appellant does not believe he has
schizophrenia, and instead claims he is nervous.  At the time, Appellant thought people in the
streets were bothering him and were against him.  He felt he was being watched, so he bought a
knife for protection.





[6]
Ms. Rodriguez testified that she was able to escape when her blood squirted on
Appellant=s face
and shirt and she observed Appellant fleeing the second floor by elevator.  Officer Wasmuth testified that he did not see
any blood on Appellant when he detained him at his room.