**Opinion issued July 8, 2021**



In The

# Court of Appeals

### For The

## First District of Texas

_____

### NO. 01-20-00303-CR

_____

### KRYSTLE CONCEPCION VILLANUEVA, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

**On Appeal from the 428th District Court**
**Hays County, Texas[1]**
**Trial Court Case No. CR-17-0182-D**

---

## MEMORANDUM OPINION

Krystle Villanueva was convicted of capital murder in the death of her five-

year-old daughter. In the same trial, she was convicted of aggravated assault with a

---

[1] The Texas Supreme Court transferred this appeal from the Austin District through a docket equalization order.

deadly weapon for stabbing her boyfriend's stepfather during the same episode. She argued the affirmative defense of insanity. The jury rejected her defense and convicted her of both offenses. Her two sentences were ordered to run concurrently, with the capital murder conviction having the lengthier sentence of life imprisonment without the possibility of parole.

In a single issue, she appeals the jury's rejection of her affirmative defense of insanity, arguing that the jury's decision on that issue was against the great weight and preponderance of the evidence so as to be manifestly unjust.

We affirm.

## Background[2]

Krystle Villanueva and Refugio (Junior) Hernandez met as teenagers. Around the age of 19, Krystle[3] had a daughter, who they named Giovanna (Gio) Hernandez. At times, the couple lived together with their child. At other times, Junior would live with his mother and stepfather—Nancy and Eustorgio Arellano–in Kyle, and Krystle and Gio would live with Krystle's relatives. In late-December 2016, the couple

---

[2]    A note before we begin. The evidence in this case is graphic and gruesome. We will discuss the details of the child's death and what happened to her body only to the extent necessary to resolve the issue raised on appeal.

[3]    We will refer to Villanueva and her family members by their given names for ease of reading and because various people share last names.

discussed Krystle and Gio moving back in with Junior, Nancy, and Eustorgio. At the time, Krystle was 24 years old, and her daughter, Gio, was 5 years old.

Krystle and Gio moved into the home in Kyle on January 3, 2017. That night, Junior took Krystle to the hospital because she had vomited. The witnesses dispute the events surrounding her illness. At trial, Krystle presented evidence that she had a delusional break from reality that evening, shaved off some body hair, and drank bleach to rid herself of a "witch." Neither Junior nor Eustorgio confirmed that version of events. The attending physician who treated her that evening did not either.

Two days later, on January 5, Junior and Nancy left for work early in the morning. Eustorgio spent the morning in his bedroom watching TV. Krystle did some laundry, bathed Gio, and sat outside looking at her computer. Around lunchtime, Eustorgio was sitting at the kitchen table eating when he saw Krystle retrieve a large knife from the kitchen and go into her bedroom. Neither spoke to the other. Eustorgio testified that this was normal behavior for Krystle, who had a habit of going into her bedroom with a knife to cut up and eat fruit.

Gio was in the bedroom when Krystle entered it with the knife. Eustorgio recalled hearing Gio say, "No, Mommy. No, Mommy." But, to Eustorgio, it sounded like the child's normal protestations when, for example, electronics were taken away from her.

A short time later, Krystle returned to the kitchen and walked past Eustorgio. After she passed him, she turned and plunged the knife into his back. She stabbed him four times before he could turn to face her. Then she stabbed him twice more. He bit her hand, which caused her to drop the knife. He picked up the knife and fled to his neighbor's house for help. His neighbor called 911 at 12:50 p.m.

While Eustorgio and the neighbor were on the phone with the 911 operator, Krystle came outside with a BB gun. She said nothing. She just pointed the BB gun at Eustorgio and the neighbor. The BB gun was not functional; it did not fire. Krystle went back into the house.

While one 911 operator continued to talk to Eustorgio and the neighbor, another 911 operator answered a call from Krystle. A recording of the 911 call was played for the jury. Krystle told the operator, "These f— people are trying to kill me," and she gave her address. A couple minutes passed without her answering any additional questions. Then she repeated that people were trying to kill her. The operator asked who was trying to kill her, and she responded that it was her dad. The operator asked her for her name. At first, she said "Krystle," but then she said, "Nathaniel Walker."

The operator asked her if her dad had a weapon, and Krystle responded: "No. No, he was just watching TV. My daughter wanted some cereal and I killed her." The operator sought to confirm her statement, and Krystle repeated: "Yeah, I killed

4

her and I stabbed my father-in-law." Minutes passed, and the operator heard loud banging and asked Krystle what she was banging on. Krystle responded: "Nothing. I'm just trying – I cut my daughter's head off." The operator asked her why, and she replied, "'Cuz she wanted cereal." The operator continued to hear loud noises and asked Krystle what was making those noises. For 10 minutes, Krystle did not respond. Eventually, she replied, "Yes, I'm here," but she did not answer any questions or say anything else for the remainder of the 911 call.

Police officers began arriving about 10 or 15 minutes after the first 911 call. They took the knife from Eustorgio and sent him to the hospital in an ambulance. SWAT officers arrived next. A neighbor saw the SWAT officers arrive and called Krystle's mother in Austin. Krystle's mother, younger sister, and nephew drove from Austin to Kyle.

Over the next hour, the SWAT officers called for Krystle to come outside. Krystle's mother spoke to the officers and offered to go inside but was refused. Eventually, there was a loud bang at one door, and the officers entered another door to remove Krystle. She had just taken a shower. She was removed from the home in handcuffs with a sheet around her nude body. She resisted the officers and had to be carried to a police car. Once placed in the police car, she began banging her head and feet on the windows, so she was removed and placed on the ground.

One testifying officer, Detective K. Lysek, described her as "spitting at everyone, and she was kind of smiling and laughing because it seemed to amuse her that she was giving us such a struggle." The officers placed a "spit sock," padded helmet, and "wrap" body restraint on her. The jury was shown video from Lysek's bodycam. Krystle is in the wrap, and the police are putting the spit sock and helmet on her. After they place her in the car, she screams loudly.

Lysek drove Krystle to a hospital. The bodycam continued to record. Krystle grunts and kicks a few times during the ride to the hospital. At one point, she says her restraints are tight. Then she spontaneously asks, "Hey, do you have any weed on you? I need to smoke a joint."

When they arrive at the hospital, the officers are seen on the bodycam video comforting each other. An officer is heard sniffling. Then the officers place Krystle on a stretcher to wheel her into the hospital. One officer is seen pointing to Krystle on the stretcher and noting, "And she is laughing."

The bodycam then shows Krystle in an examination room. She screams repeatedly. The medical personnel ask her what her name is, and she responds, "I don't have one." They ask if she knows why she is there and she makes a hmmm-hmmm sound that does not clearly indicate an affirmative or negative response. They ask if she has any injuries, and she says she has a bite. She struggles against the restraints and screams loudly again. Krystle's tone abruptly changes and she  asks,

6

"Do you have any weed?" Someone responds, "Shut up." The video ends seconds later.[4]

The jury was shown additional videos of the police moving Krystle to another facility and preparing her for a police interview. In one video, two officers are seen in the front seat of a police car as the audio picks up Krystle speaking from the back seat. She is crying and says, "My baby [inaudible] I didn't know it was her [inaudible and crying] Just kill me. I didn't know, I swear, I thought it was a doll. I thought it was a f— clone. . . . I'm so sorry baby. I swear to God. Was it really? I thought it was a [crying] no, no, no, no, no.  Just kill me. I didn't realize. I swear to God. I swear I thought it was a doll. I thought it was a f— clone. [inaudible, crying] My baby. Just kill me, please. [inaudible, crying] That was my baby. I don't deserve to live. [crying] I'm so sorry. That was my baby and [inaudible] a f— key. [inaudible] I lost it. I'm so sorry. . . . I didn't know it was real. I'm so sorry." She repeated these comments, crying, for several more minutes.

In the next videos, Krystle is being dressed into jail clothing and interviewed by Sergeant Opiela. She is crying and says, "Oh my God. I f— up. I thought it was a key. I really thought she was a f— clone. I really lost it. There are so many voices in my f— head. I thought she was a clone."

---

[4]    There is no indication in the record that a competency evaluation was requested or performed.

Sergeant Opiela reads Krystle the *Miranda* warnings and asks if she understands them. She says, "I'm trying to focus. There are so many voices in my head." He attempts to begin a dialogue with her by asking what type of gaming system she likes to play. Crying, she says, "Why does it matter? I just killed my daughter." Then she says, "I haven't slept in days. There are so many voices in my head." He tells her, "Listen to my voice. This is the voice you are listening for." Then he asks her if she understands the *Miranda* warnings he read to her. She takes the written copy, looks at it, and asks him to read it to her. He re-read it a third time and asks her to sign it. She stares at the paper again for several minutes without signing it.

Opiela offers to read the warnings again. Krystle hands the paper back to him, and he reads the warnings a fourth time. He again asks her to sign the warnings, pointing at the signature line. Krystle stares at the paper for several more minutes. He reads it to her again while she stares down with a confused expression.

After 30 minutes of this, Krystle writes "no name" on the signature line. Opiela tells her that is not her name. He spells her name to her as he asks her to sign her name. She continues to stare at the page. He asks whether she is listening to him. Krystle does not react, verbally or physically. After a few more minutes, she asks him to read it again.

Krystle's expert witness, Dr. West, testified that, based on information she learned during her interview of Krystle that Krystle had thought the paper with the written *Miranda* warnings was a contract to enter into prostitution, which is why Krystle had hesitated to sign it.

As the video continues playing, Opiela asks Krystle again to sign the paper. After 10 more minutes, Krystle signs the paper, and the two begin talking. Opiela asks her a few questions that she does not directly respond to. Later, Opiela asks her why she is there, and she says, "Because I killed my daughter." He asks more questions, but she does not answer. Then Krystle says, "I thought she was a doll. I thought she was a doll, I swear."

He asks her where Gio's body parts are. Krystle asks him, "What body parts?" He asks her where Gio's head is. Krystle says, "It was there." Eventually, Krystle starts screaming "Gio" repeatedly, and then cries, "I need my baby, please." Opiela asks her to explain what happened in the house. Krystle appears to need to vomit. Opiela gives her a trash can to vomit it; instead, Krystle begins digging through it. He asks her again what happened in the bedroom. Krystle says, "I thought she was a clone."

Later, Krystle asks, "Where is my daughter?" Opiela asks again what happened to Gio. Krystle replies, crying, "I f— killed her." He asks her how. Krystle paces and cries. Opiela repeatedly asks her to sit back down. She tries to pull her

9

pants down. He tells her not to and to sit down. She stands, hunched over. The other officer in the room motions toward Krystle and leaves the room. More officers come in, and they place Krystle on the floor. Opiela tells the officer helping him that Krystle has feces in her hands.

In yet another video from the night of Gio's death, Krystle says to the officers:

> There's so many voices in my head. I'm going crazy. I'm so sorry. I'm so sorry. What the f—? [inaudible] I didn't know. I didn't know. . . . I lost my mind. I lost my mind. [inaudible] Oh my God. I lost it. Oh, man. Oh, no. [inaudible] in my head. What the f— is – Oh man. I'm so sorry." Then later, "I'm sorry. I'm sorry. I thought my daughter was a – I don't know why I thought my daughter was a clone. Oh, no, no, no, no." Still later, she said, "Where am I? [inaudible] I don't know what the f— is going on. I thought my daughter was a clone. For some reason, I thought my daughter was a clone. [inaudible] telling me one thing, and I feel like my head is telling me something else. I don't deserve to live. I killed my daughter. [inaudible] Why do I feel like – I felt like I was in a f— game. My mind was telling me I was in a game. What is going on? [inaudible] I'm sorry. I'm so sorry baby. Why do I – I've got so many f— voices in my head. I feel like my daughter's talking to me right now. I'm sorry. I'm so sorry. What the f— is going on? . . . . My head. My daughter.

Jail records state that Krystle was diagnosed with psychosis five days later and prescribed medications. There are multiple treatment records indicating that she has refused medications while in jail.

Krystle did not testify. These videos were the only direct evidence the jury received of Krystle discussing the events. Krystle's insanity defense relied on her statements in these videos, the testimony of her sister and mother about her history

of paranoia and delusions, and the expert testimony of a retained psychiatric expert, Dr. S. West.

The State called 19 witnesses, including police officers, a doctor who treated Krystle at the hospital on January 3, a medical examiner, a toxicologist, and then Junior and Eustorgio. The State did not present a medical expert to opine on Krystle's mental state.

The officers described Krystle's arrest, their investigation of the crime scene, Krystle's statements while being transported, and their recorded interviews of her. The testimony of the medical examiner and other evidence revealed that Gio had been stabbed and her body had been severely mutilated. Many of her injuries were post-mortem. We will not detail them but will summarize as follows: various appendages were cut off, her skin was sliced open from the top of her back down the length of her back and continuing, her head was removed, and various internal organs were removed and piled on her.

The toxicologist, S. Peyton, testified about alcohol and drug testing performed a couple hours after Krystle's arrest. Keeping in mind that .08 blood-alcohol content is the level for intoxication in Texas, Peyton said that, comparatively, Krystle's blood-alcohol level was .035. She testified that the human body metabolizes, on average, .02 grams of alcohol per hour. So, if the jury were to do the math, then, at

the time of Gio's death, Krystle's blood-alcohol level would have been somewhere near .08.

The toxicologist also testified that Krystle's blood was "presumptively positive" for marijuana, which means that they did not confirm it was marijuana in her system, but the test results were consistent with the presence of cannabinoids.

Junior testified. He agreed that he had taken Krystle to the hospital two days before Gio's death because she had thrown up. Junior agreed he had seen cleaning supplies, like bleach, on the floor in the bathroom, but he denied thinking she had swallowed bleach and denied ever telling anyone that she had. He also denied talking to Krystle's mom about the hospital visit or telling her that Krystle thought his parents were trying to poison her. In response to the question about Krystle thinking someone was trying to poison her, he testified, "Man, ain't nobody try to poison her. She didn't tell me nothing like that."

Junior testified about his interactions with Krystle the morning of Gio's death. His father, Eustorgio, also testified about his interactions with Krystle that morning up to the point when she stabbed him. Junior said Krystle appeared normal to him. Eustorgio testified that she behaved normally until she attacked him with the knife.

The defense witnesses were Krystle's (1) sister, Samantha, (2) mother, Minia, and (3) expert psychiatrist, Dr. West. Dr. West testified that she specialized in filicide, which is the study of parents who kill their children. West explained to the

jury that there are certain driving forces that lead parents to kill their children. One of those is psychosis that causes the parent to develop their own detached sense of events that does not match reality. The parents can suffer from delusions that make them think bizarre thoughts about their children and inaccurately evaluate the events and associated risks.

One type of psychotic delusion is Capgras Syndrome. Dr. West testified that Krystle has Capgras Syndrome, which she explained to the jury refers to the delusional belief that loved ones have been replaced with impostors. According to Dr. West, based in part on her interview of Krystle before trial, Krystle believed that Gio had been replaced by a clone/impostor and that she had to return the clone to get Gio back. Further, Krystle believed there was a key inside Gio's body that she had to find and return—again, to be able to get the real Gio back. In Dr. West's expert opinion, Krystle did not understand she was stabbing and cutting into Gio, a living person. Rather, she thought she was doing that to an inanimate clone in search of a key and that it was necessary to do so to "get her real daughter back."

Dr. West testified that this was not an isolated incident of psychosis. After reviewing Krystle's medical file and speaking with Krystle's mother and sister, Dr. West opined that Krystle had a history of untreated mental illness. She testified about a time in June 2015 when the police encountered Krystle walking along the side of a highway, supposedly fleeing from a man named "Santana." Dr. West reviewed the

medical records from that ER visit and determined that Krystle was diagnosed with a psychotic disorder with paranoia and delusional beliefs.

Krystle's mother, Minia, testified that Krystle talked to her about Santana in 2016 and told her that he was capable of turning into a bird, flying to find her, and hurting Gio or Junior. Minia recounted the story to Dr. West in their interview.

Dr. West also discussed a drug rehabilitation stint in 2016. Krystle told the staff she had bipolar disorder, and they prescribed her medications. In Dr. West's expert opinion, the proper diagnosis for Krystle was not bipolar disorder, but, instead, psychosis.

According to Dr. West, Krystle's sister, Samantha, shared stories of Krystle's past delusions. For example, Krystle would sometimes hide in closets or disappear for days. Krystle would tell family members that the devil was searching for her, that a picture was being used to hex or curse her, and that, at various times, there were snipers in the trees outside their home. Once, Krystle screamed at family members to get down and claimed to have seen a "red dot" on one person's forehead from a sniper's gun. Another time, Krystle disappeared while inside a store, and Samantha found her hiding in the bathroom. Krystle was scared. Samantha told Dr. West that Krystle had thought that CIA agents were after her. Samantha confirmed these events when she testified.

During her own interview with Dr. West, Krystle discussed an event in late 2016 when she was shopping with Gio and Junior. Krystle reported that she had come to believe that Gio was a witch. She looked at Gio that day and said, "You're not my daughter." Gio cried. Junior asked what she meant, and she did not respond.

Krystle also told Dr. West that she once stood over Junior with a knife, thinking that she needed to kill him because he was an impostor. Gio stirred, and her activity brought Krystle back to reality. Based on Krystle's description, this event occurred the evening before Gio's death—about 12 hours before she stabbed Eustorgio and killed Gio.

Krystle told Dr. West that she never fully shared these past thoughts with medical personnel before Gio's death because she was afraid of being sent to a psychiatric hospital. That was the reason, according to Krystle, that she did not tell the ER doctor on January 3 that she had swallowed bleach and shaven herself to get a "witch" out of her. Instead, she only discussed the possibility of additional drug rehabilitation with the doctor that night.

Dr. West recounted Krystle's version of events on January 5. Krystle woke up agitated. She went outside to watch videos on her computer to calm down, but it did not help because it appeared that the videos were reacting to her eye movements. She smoked a cigarette, but then the cigarette looked like it changed from tobacco to tea leaves. Gio woke up and asked for cereal. Krystle had her take a shower. The

"next thing she remembers is that she's strangling her, and she has a knife and she's stabbing her, and she is looking for a ring."

According to Dr. West, Krystle did these things to Gio and her dead body because Krystle "was very ill, psychotic, delusional at this time, she did not, in [Dr. West's] opinion, know the wrongfulness of what she was doing. She interpreted this as simply cutting up something that wasn't in existence. It was a doll. It was a clone. It was not her daughter. It wasn't human; therefore, it's not a crime."

Dr. West testified that Krystle also thought that Eustorgio was a clone who had to be returned to get Gio back and that Krystle had called 911 because her attempts to get Gio back were not working—Eustorgio had escaped, and Krystle could not find the key inside the clone-Gio. Krystle was calling 911 to help her, in Dr. West's view.

Dr. West testified that the police bodycam videos were capturing the moments when Krystle was coming out of her delusional state and beginning to realize that what she had thought was real actually was not. Dr. West noted that in one video clip Krystle is heard saying, "They tricked me." She explained to the jury that this demonstrates Krystle's dawning understanding that what she had thought she needed to do to get Gio back was not reality.

16

Dr. West also noted the pace and content of Krystle's interactions on the videos. She opined that they were evidence of disorganized behavior and being inundated with voices inside her head, which are signs of psychosis.

Dr. West testified that Krystle was severely delusional on the day of Gio's death—she was suffering from psychosis that prevented her from knowing the difference between right and wrong, meaning that she met the definition of legal insanity. Dr. West's diagnostic impression, tied to the time of the offense, was "unspecified schizophrenia spectrum and other psychotic disorder" with paranoia and disorganized thoughts and behaviors. The schizophrenia is labeled "unspecified," according to Dr. West, in recognition of evidence that Krystle had used marijuana days before Gio's death. Dr. West testified that she could not definitely rule out substance abuse as a causal factor precipitating Krystle's symptoms; yet she could opine that the "severity and longevity of her psychosis suggests otherwise," meaning that marijuana use would not have been the cause of Krystle's behavior.

Dr. West's report was included as a trial exhibit. It lists "unspecified schizophrenia spectrum and other psychotic disorder" as the diagnostic impressions at the time of the offense. It notes Krystle's history of drug use and a low IQ of 77. It concludes that Krystle was experiencing symptoms of psychosis when she attacked Gio and Eustorgio; that she did not know her actions were wrong at the time

because she believed her family had been replaced by clones; that, although she has a history of substance use, "the events of January 5, 2017 are unlikely to flow from drugs or alcohol; and that Krystle "was suffering from a severe mental disease, namely unspecified Psychosis. Because of this [she] did not know what she was doing was wrong."

Krystle's younger sister, Samantha, testified. She told the jury that she and her mother received a call from a relative who saw the police at the Kyle home. They immediately drove to Kyle. She saw the police remove her sister from the home. She spoke to police at the scene, and she participated in a police interview two days later. Samantha thought that drugs might have been involved because Krystle had a history of drug use.

Samantha was asked about events in the days before Gio's death. She said that, just a couple days earlier, she and her son and Krystle and Gio were all living with a relative. Krystle was in a back bedroom alone, sitting cross-legged on the bed, and laughing loudly. Samantha went back to the bedroom to check what was going on. Krystle was sitting there alone, just laughing. Later that day, Samantha went back to check on her again. Krystle was taking her cellular phone apart. She had the battery in one hand and the rest of the phone in the other. Krystle commented that the phone was still beeping and asked Samantha if she could hear it. Samantha told

her that she could not hear it. Krystle continued to take the phone apart with a pair of tweezers until it was in pieces.

Samantha was asked how she reacted to Krystle's behavior. Samantha testified that Krystle had a history of being paranoid, thinking that people were watching her and other conspiratorial thoughts. Samantha thought the paranoia was odd, but she recalled Krystle displaying paranoid behavior since Samantha was a young child, so, to Samantha, it seemed like normal behavior—normal for Krystle.

For example, Samantha remembered that Krystle would always cover the camera of her phone with duct tape to prevent people from watching her. She remembered that, in 2013, Krystle became paranoid that the devil was coming after Gio because Gio had a "pure" soul. Another time, Krystle saw a drawing and panicked, believing that it was an indication she was cursed. That same year, Krystle disappeared for three days. When she returned, she ran into the house and said God had touched her and shown her everything and now the devil was after her. Krystle went to the shower and sobbed. By the time she got out of the shower, she appeared fine again.

Yet another time, in 2015, Samantha and Krystle and their kids were in a store when Krystle ran off. Samantha found her hiding in the store restroom. Krystle said that the CIA was in the store and had found her. Krystle appeared frightened and would not leave the restroom. Samantha had to tell her that the CIA left before

19

Krystle would leave the restroom. Many times, Samantha found Krystle hiding in the closet of their home, and Krystle would explain that she was hiding from either the CIA or the devil.

Samantha testified that these paranoid episodes would occur at random, "one minute she's fine, the next she's not. There was really no pattern to it." Samantha agreed that Krystle had a history of drug use, but she also testified that, at least with regard to the store-restroom incident and hiding from the CIA, Samantha knew that Krystle had not been on drugs those days.

On cross-examination, Samantha agreed that, on the day of Gio's death, she had told the police that there actually was a pattern to Krystle's behavior—that Krystle acted odd when she was on drugs. Specifically, she told the police that Krystle used marijuana and Xanax along with other drugs and that Krystle would behave weirdly and think the CIA was listening to her when she was using meth.

Samantha also agreed that she had not shared any of these specific stories of delusions and paranoia with the police when they interviewed her for 30 minutes immediately after Gio's death. But, later in her testimony, Samantha said that she had mentioned to the police that Krystle had a history of being paranoid and thinking the CIA was watching her. She testified that she also told the police that Krystle had a history of thinking she saw ghosts and that there had been times when Krystle

20

would speak, Samantha would ask her what she had said, and Krystle would tell her that she was talking to someone else, even though no one else was in the room.

Samantha testified that Krystle would not take drugs around Gio, but she would be under the influence of drugs in Gio's presence. Samantha also testified that Krystle was never violent with Gio, even when Krystle used drugs.

Samantha and Krystle's mother, Minia, also testified. She said that she, Krystle, Samantha, and their children were all living together with another relative days before Gio's death. Minia had planned to leave for Nicaragua on January 7. In advance of that, Krystle and Gio were moving in with Junior and Junior's parents. On January 5, she received a call from another relative who lived near Junior's parents, saying she needed to come there. She saw the police removing Krystle from the house.

Minia testified about Krystle's behavior in the months before Gio's death. About two months before, Krystle became much quieter and stayed in her room a great deal of the time, staring at the ceiling.

Minia also testified that, when Krystle was around the age of four or five, a male cousin had been "doing stuff to her," which caused a strain in family relationships. Minia testified that, beginning around the age of nine, Krystle would report seeing a "shadow" boy in their home. After they moved, she reported seeing him in the new house too. The boy was referred to as a "shadow" or "ghost." Later,

21

around age 21, Krystle would talk about people watching her through the air vents. Shortly after, there was an incident when Minia came home to find the police assisting Krystle. Krystle had called them to report that there were people with guns in the trees. No one was there. Minia took her daughter back into the house. That evening, Minia saw Krystle lying on the floor. Krystle told Minia to get down because people with guns were in the trees. Then, Krystle told Minia that Minia had a red dot on her forehead. Minia described this as paranoid behavior. Still later, Krystle tried to convince her family members to get rid of their phones because she believed the government was tracking them. Yet another time, Minia was in the home when Krystle looked outside and began screaming. Minia asked what happened, and Krystle said there was a man outside holding a gun. No one was out there, but Krystle thought it was real.

A year or two later, Krystle went to the hospital after being found walking along the highway. She reported that a man had attacked her. She referred to him as "Santana." Months later, Krystle told Minia that Santana could become a bird and follow her around, which made Krystle fearful for her own safety, as well as Gio's and Junior's.

Minia testified that, as each of these incidents occurred, she thought it was because Krystle "smoked weed." Krystle spent some time in a rehabilitation facility. Minia thought it was for drug use, but she was not sure.

The State's closing argument emphasized their theory of the case, which was that Krystle's past episodes, as described by Samantha and Minia, were drug-related. She had a documented history of drug abuse. The State suggests that Krystle could have been ingesting intoxicating substances during the morning of January 5, when Eustorgio was in his own bedroom. The State emphasized that Krystle never spoke of clones or people being dolls on the 911 call or at the hospital. It was only after her blood was drawn and she was tested for marijuana, that Krystle started talking about clones and dolls.

The State further emphasized that Samantha and Minia always thought Krystle's behavior was drug-related; that they had a chance to tell the police immediately after Gio's death about delusions, paranoia, snipers in trees, and so on; and they did not mention it. The State reminded the jury that it was not until later that Minia and Samantha took the position that "suddenly she's crazy." The State argued these were not credible witnesses—they were there only to help Krystle.

The State further emphasized that there were trash bags around Gio's body at the crime scene, which the State argued was evidence of Krystle trying to dispose of evidence of her crime. The State posed the question for the jury: "And if you know enough to know that you need to dispose of evidence, you certainly know enough to know you've done something illegal."

Finally, the State argued that Dr. West was a "hired gun" who came into court with a goal of helping Krystle establish insanity and, in doing so, ignored any evidence that indicated guilt.

Krystle's closing argument emphasized that filicide—the killing of children—is a recognized area of psychology and that psychosis is one of the documented reasons parents kill their children. Krystle's medical records and family testimony were summarized, highlighting references to delusions and hallucinations. The jury was told that no motive had been uncovered for killing Gio—that the only explanation was the psychosis Krystle was experienced at the time.

The jury was reminded that the medical personnel who saw Krystle after her arrest had diagnosed her with psychosis, just as Dr. West had. They were reminded of Krystle's confused state in the bodycam videos, particularly during her police interview.

In conclusion, the jury was told that "mental illness is real" and that "mental illness caused that mother to kill that daughter . . . And it's hard for people to understand this . . . But she didn't choose it . . . If she was in her right mind, she never would have done this, but she was not."

In its rebuttal, the State argued that Krystle might not have been "in her right mind," and she may not have asked for that to be the case, "but she did bring it on herself." The State argues that voluntary intoxication negates the defense of insanity

and, because Krystle had alcohol and marijuana in her system, she chose to be intoxicated, which means she does not meet the criteria for an insanity defense. At the conclusion of its closing, the State argued that it would not be just or right to sit in judgment of a person with a history of drug-induced episodes of losing touch with reality, know that she was on drugs when she killed her daughter and mutilated her body, and then tell her it was not her fault because she is "insane." "She did something crazy that day . . . but she was not insane," under the legal definition, the State argued.

The court's charge gave the jury three options regarding guilty and innocence on the two offenses of capital murder and aggravated assault. They could find her guilty, innocent, or innocent by reason of insanity. The charge instructed the jury that a person's conduct that would otherwise be a crime is not a criminal act if, "at the time of that conduct, the person, as a result of severe mental disease or defect, did not know that the conduct was wrong," and thus was insane. They were further instructed that temporary insanity caused by voluntary intoxication "does not constitute a defense to the commission of crime" and that the term "intoxication" means "disturbance of mental and physical capacity resulting from the introduction of any substances into the body."

The jury found Krystle guilty of both offenses, and the trial court sentenced her to life in prison without the possibility of parole for the capital murder offense and 20 years' confinement for the aggravated assault offense.

Krystle appealed the jury's rejection of her insanity affirmative defense, arguing that their verdict was against the great weight and preponderance of the evidence to be manifestly unjust, i.e., factually insufficient.

**Insanity Affirmative Defense**

Krystle challenges the factual sufficiency of the evidence to support the jury's rejection of her insanity defense. She does not challenge the sufficiency of the evidence to support the jury's finding of the essential elements of capital murder.

**A.    Applicable law**

Texas presumes that a defendant is sane and that she intends the natural consequences of her actions. *Ruffin v. State*, 270 S.W.3d 586, 591 (Tex. Crim. App. 2008). Insanity is an affirmative defense that the defendant has the burden to prove by a preponderance of the evidence. TEX. PENAL CODE §§ 2.04(d), 8.01(a); TEX. CODE CRIM. PROC. art. 46C.153(a)(2). Insanity excuses a person from criminal responsibility even though the State proves all elements of the offense, including mens rea, beyond a reasonable doubt. TEX. CODE CRIM. PROC. art. 46C.153(a).

Insanity under the law is defined as (1) "a severe mental disease or defect" that (2) resulted in the actor not knowing that his conduct was wrong at the time of

the offense. TEX. PENAL CODE § 8.01(a); *Bigby v. State*, 892 S.W.2d 864, 878 (Tex. Crim. App. 1994). "Under Texas law, 'wrong,' in this context, means 'illegal.'" *Ruffin*, 270 S.W.3d at 592. Even if a defendant believes his actions were morally justified, so long as the defendant knows the actions were illegal, the affirmative defense of insanity is not available. *See id.*

There are two additional limitations on the insanity defense. First, voluntary intoxication and temporary insanity caused by intoxication do not allow for the insanity defense. TEX. PENAL CODE § 8.04; *Afzal v. State*, 559 S.W.3d 204, 208 n.4 (Tex. App.—Texarkana 2018, pet. ref'd). Temporary insanity caused by intoxication may be used as mitigation evidence during the penalty phase of a criminal trial, but it cannot be relied on to obtain a verdict of not guilty by reason of insanity. *See* TEX. PENAL CODE § 8.04; *Ex parte Martinez*, 195 S.W.3d 713, 722 (Tex. Crim. App. 2006). This means that, if a person experiences temporary visual and auditory hallucinations, paranoia, and other psychotic symptoms because they are under the influence of drugs and commits a crime in that delusional state, the affirmative defense of insanity is not available to obtain a not-guilty verdict—it is only relevant to punishment for the crime. *See Afzal*, 559 S.W.3d at 209–10.

Second, the affirmative defense of insanity is a legal issue, not a medical one. *Graham v.* State, 566 S.W.2d 941, 949 (Tex. Crim. App. 1978); *see Plough v. State*, 725 S.W.2d 494, 500 (Tex. App.—Corpus Christi 1987, no pet.). A person may meet

27

the medical definition of insanity but be legally denied access to an insanity defense because, even though she suffers from delusions, she still understands that her actions are illegal. *Graham*, 566 S.W.2d at 949.

The determination of whether a person understands that her actions are illegal is reserved to the factfinder. *Id.*; *Dashield v. State*, 110 S.W.3d 111, 115 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). An expert's opinion may aid the factfinder in resolving the issue, but the expert may not dictate the result. *Graham*, 566 S.W.2d at 948–49; *McAfee v. State*, 467 S.W.3d 622, 636–37 (Tex. App.— Houston [1st Dist.] 2015, pet. ref'd); *Dashield*, 110 S.W.3d at 115. As we have stated, "The ultimate issue of criminal responsibility is beyond the province of an expert witness; otherwise, the issue 'would be tried in hospitals rather than in courts.'" *Dashield*, 110 S.W.3d at 115 (quoting *Graham*, 566 S.W.2d at 949).

The factfinder's determination is based, at least in part, on its credibility determination of various witnesses' testimony. *Id.* The circumstances of the crime itself are also important in determining the mental state of the accused at the time of the commission of the offense. *McAfee*, 467 S.W.3d at 637. The jury may consider evidence indicating knowledge of wrongful conduct, such as an attempt to conceal incriminating evidence or elude law enforcement. *Id.*; *see Torres v. State*, 976 S.W.2d 345, 347–48 (Tex. App.—Corpus Christi 1998, no pet.).

The *Graham* case provides an illustration. There, a man (Graham) stopped by the house of an acquaintance and invited her out for drinks. 566 S.W.2d at 943. He began making sexual advances to her, which she declined. *Id.* at 944. He became aggressive, eventually hitting her. *Id.* Then he "came back to his senses," apologized, and bought first-aid supplies to care for her wounds. *Id.* He almost took her home but hesitated, fearing she would tell her parents. He drove her to a secluded area, threatened her with a knife, tied her up, and sexually assaulted her. *Id.* He left for a while, returned, and then beat her. *Id.* After "he got his senses back," he untied her and asked her whether *he* had done that to her. *Id.* When she said he had, Graham apologized, saying "Well, I'm sorry. I guess I have been drinking too much." *Id.* They went to his car, but he feared taking her home. *Id.* She promised not to go to the police. He dropped her off at her house five and one-half hours after picking her up. *Id.* She testified that she thought he knew what he was doing and that his statements of apology were just "to make me feel better toward him or something." *Id.* at 945.

Two psychiatrists testified that Graham had schizophrenia with paranoid delusions. *Id.* at 946. They explained that schizophrenic persons often have difficulty distinguishing fantasy and dreams from reality and that remissions can occur dramatically, with changes from hour to hour "or maybe even quicker." *Id.* Further, one can be in a delusional state where he does not know right from wrong, quickly

enter into a period of remission where he knows what he is doing, knows that it is wrong, and is capable of conforming to the law, and then return to a delusional state. *See id.* at 946. According to the psychiatrists, Graham first showed signs of schizophrenia a year before the offense. *Id.* at 947. Graham later told his doctor that he thought the rape happened as a nightmare while he slept. *Id.*

The jury rejected Graham's insanity defense. *Id.* at 943. The Court of Criminal Appeals affirmed the conviction. *Id.* at 954. First, the Court noted that the burden is on the criminal defendant to establish the defense of insanity by a preponderance of the evidence and that the State is under no burden to establish sanity or supply expert testimony on the topic. *Id.* at 950. Second, the Court emphasized that a jury may accept or reject in whole or in part lay testimony and expert testimony. *Id.* at 950–51. Third, the Court noted that the two psychiatrists allowed for periods of remission "at irregular and unpredictable intervals." *Id.* And finally, the Court focused on the woman's testimony that Graham apologized after beating her and displayed fear of taking her home because she might go to the police or tell her parents. *Id.* at 952. According to the Court, Graham's apologies and fear of detection could be viewed as evidence he was aware of his actions and of the wrongfulness of them. *Id.*

The Court concluded that the jury had weighed the evidence, made credibility determinations, and performed its role in deciding the insanity defense beyond the medical definition of insanity, taking into account the "inarticulable ethical

component, which includes imperatives of free will, self-control, and responsibility for one's acts that are fundamental to our notions of man, and that are the foundation of social relationships and criminal responsibility built on such a concept of man." *Id.* at 953. The Court then affirmed the conviction, declaring, "Rarely will this Court overturn a jury's findings on this issue." *Id.*

In sum, when presented with an insanity defense, the factfinder's ultimate question is whether "the defendant factually know[s] that society considers [his] conduct against the law, even though [he], due to his mental disease or defect, may think that the conduct is morally justified." *Ruffin*, 270 S.W.3d at 592. If the defendant understands his conduct is illegal, the defense is not available. *See id.*

## B. Standard of review

Krystle challenges only the factual sufficiency of the evidence to support the jury's rejection of her affirmative defense. By challenging the factual sufficiency of the evidence to support the adverse finding, she is asserting that the adverse finding was so against the great weight and preponderance of the entire body of admitted evidence as to be manifestly unjust. *See Matlock v. State*, 392 S.W.3d 662, 670 n.29, 671 (Tex. Crim. App. 2015). In review of the factual sufficiency to support the jury's rejection of an affirmative defense, we consider all the evidence in a neutral light while preserving the factfinder's weight and credibility determinations. *Id.* at 671. We may find the evidence factually insufficient only "if, after setting out the relevant

31

evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, [we] clearly state[ ] why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased." *Id.* If we so conclude, the remedy is a new trial, not acquittal. *See id.* at 672.

**C.    Analysis**

Viewing the evidence in a neutral light while preserving the jury's credibility determinations, we hold that the jury's rejection of the insanity defense was not so against the great weight of the evidence as to be manifestly unjust. *See Matlock*, 392 S.W.3d at 671.

The evidence presented to the jury regarding whether Krystle knew her behavior was legally wrong came from Dr. West. She testified that Krystle did not know her behavior was wrong because she thought she was attacking clones, not real people. The jury reasonably could have rejected Dr. West's opinions and, based on Krystle's own recorded statements after Gio's death, determined that she knew she was killing her daughter and stabbing Junior's stepfather. *See Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008) (holding that witness credibility issues are reserved to the jury, which may choose to believe some testimony and disbelieve other testimony); *Davis v. State*, 177 S.W.3d 355, 358 (Tex. App.—Houston [1st

32

Dist.] 2005, no pet.) (stating that jury may choose to believe all or any part of any witness's testimony).

Krystle told the 911 operator that she killed her "daughter" and stabbed her "father-in-law." And she provided a reason: Gio wanted cereal. After loud banging noises, she told the 911 operator, less than an hour after the killing: "Nothing. I'm just trying – I cut my daughter's head off." Krystle's reference to those she harmed as her "daughter" and "father-in-law" on the 911 tape is some evidence that she understood they were her family members, which the jury reasonably could have concluded was inconsistent with Dr. West's opinion that Krystle did not think these were real people and therefore did not understand that her attacks were illegal.

On the police bodycam videos, Krystle repeatedly stated that she had killed her "daughter." She told the police officers to kill her for it, and she repeatedly apologized for her actions. But she also said that she thought Gio was a doll and that the two were clones. The role of resolving these inconsistent statements is left exclusively to the jury, which reasonably could have determined that Krystle's references to those she injured as her "daughter" and "stepfather" indicated an awareness that they were people, thus negating the factual basis of Dr. West's opinion that Krystle did not understand her attacks to be illegal. *See Graham*, 566 S.W.2d at 952 (affirming conviction where some evidence supported view that

33

criminal defendant was unaware of his attacks and other evidence supported view that he took action to avoid detection of his crime).

We emphasize that the jury did not have to reject Dr. West's expert opinion that Krystle has psychosis and periods of paranoid delusions for it to have rejected the affirmative defense of insanity. Under Texas law, *medical* insanity does not, by itself, meet the standard for *legal* insanity under the Penal Code to remove legal responsibility for one's actions. *Graham*, 566 S.W.2d at 953 ("The 'mental disease or defect' component is one that limits the availability of the defense, not one that automatically invokes its protective shield."). The criminal defendant's burden includes establishing that "as a result of severe mental disease or defect," she did not know that her conduct was illegal. *See* TEX. PENAL CODE § 8.01(a); *Ruffin*, 270 S.W.3d at 592.

Here, even if the jury accepted that Krystle was medically insane when she attacked Gio and Eustorgio, there still was sufficient evidence from which the jury could have determined that Krystle understood her actions were illegal. The only basis the jury had been given to conclude otherwise was Dr. West's testimony that Krystle thought Gio and Eustorgio were clones, not real people and, based on that belief, could not have believed it was illegal to cut into them. Yet, Krystle repeatedly referred to Gio as her "daughter" on the 911 call, police bodycam recordings, and during the police interview. She also referred to Eustorgio as her "father-in-law" on

34

the 911 recording. The jury could have concluded, based on these references, that Krystle understood these two people were her family members, as she described them. *See Graham*, 566 S.W.2d at 952. If the jury did so, the sole defensive theory for why she did not know her actions were illegal was negated.

Nor did the jury necessarily have to determine that Krystle was voluntarily intoxicated to have rejected the insanity defense. The jury reasonably could have determined that Krystle's actions were unrelated to the trace amounts of marijuana or the consumption of alcohol that would have elevated her blood-alcohol content to near .08—the minimum threshold for intoxication. In other words, the jury was not limited to two choices: (A) finding that Krystle's insanity was a medical condition or (B) finding that voluntary intoxication caused her insanity. It had other options, including (C) finding that, regardless of whether she was medically insane, she was aware that her actions in killing Gio and stabbing Eustorgio were illegal. And, based on that reason alone, the jury could have rejected Krystle's insanity defense without ever reaching the issue of voluntary intoxication. We conclude that there is sufficient evidence in the record to affirm the conviction without resolving the parties' dispute over whether Krystle's intoxication was layered on top of her mental illness or the cause of it.

In conclusion, after hearing all the evidence, the jury could have determined that Krystle's actions indicated that she knew her conduct was wrong at the time of

Gio's murder and Eustorgio's stabbing, even if she otherwise met the *medical* criteria of insanity. Whether we would have reached the same conclusion is not the test: the evidence was sufficient to support the jury's rejection of her affirmative defense, and the jury's decision was not so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Matlock*, 392 S.W.3d at 671; *Temple v. State*, 390 S.W.3d 341, 363 (Tex. Crim. App. 2013) (noting that an appellate court may not act as a "thirteenth juror"). We overrule Krystle's sole issue.

## Conclusion

We affirm.

Sarah Beth Landau
Justice

Panel consists of Justices Kelly, Landau, and Hightower.

Do not publish. TEX. R. APP. P. 47.2(b).